MAGNIN (JURGENSEN v.). See Case No. 7,586.

---

## Case No. 8,958.

### The MAGNOLIA.

SHUTE v. GOSLEE (two suits).

[3 Am. Law Reg. 465.]

Circuit Court, E. D. Louisiana. Nov., 1854.[1]

COLLISION—MISSISSIPPI RIVER NAVIGATION — ASCENDING BOAT—UNCERTAINTY—CARE—LOOKOUT.

1. Duties of steamers in the navigation of the Mississippi.[1]

[See Bates v. The Natchez, Case No. 1,102.]

2. A steamer leaving the ordinary and usual track of vessels under the circumstances, is bound to show some palpable necessity for the deviation.[1]

3. An ascending boat, running at great speed in a dark night, at a time when a descending boat is visible, of whose course she is doubtful, takes the risk of a collision: she ought to ease or stop her engines, till she is assured of the course of the other.[1]

4. A steamer is responsible for a collision which a better lookout than she had might have prevented.[1]

5. Where a collision is produced by the fault of one boat, she cannot complain that the other had not used extraordinary measures of precaution before, or the clearest judgment in the selection of the method of extrication after, the collision became imminent.

---

[1] [Affirmed in 18 How. (59 U. S.) 463.]

In admiralty.

CAMPBELL, Circuit Justice. These are cross appeals from a decree of the district court, pronouncing a division of the damages sustained by the respective parties in a case of collision. In February, 1851, the steamboat Autocrat, (of the largest class,) bound on a voyage up the Mississippi river, had a collision with the steamboat Magnolia, (of the same class,) near Butler's plantation, in the parish of Iberville, and was sunk, occasioning the death of several persons and the loss of the boat. The libel charges that the Magnolia was seen rounding out from Robertson's wood-yard, on the east bank of the river, and going apparently square across. That the pilot of the Autocrat tapped her alarm bell, to signify her intention to go to the right, and proceeded towards the east bank; and then the Magnolia tapped her bell, signifying her intention also to go towards the east bank, and did so accordingly;—thus the boats were brought into collision by this unskillful or reckless procedure. The Magnolia answers, that she was rounding out from Robertson's wood-yard, on the starboard wheel only, and had reached to near the middle of the river, and was nearly stationary, her head pointing down, when the Autocrat, with a full head of steam and with great rapidity, "came upon her"—that the Autocrat left her usual and proper track without any necessity, to come upon the proper track of the Magnolia, and in disregard of the signal bell, which she rang upon the first perception of this movement. This abandonment of the proper track of the Autocrat, and this neglect of the signal bell, are pleaded as the causes of the great calamity. The officers of the respective boats who were on duty at the time, have been examined, and to them we are indebted for an account of what took place. I conclude from that testimony, that the collision took place a short distance above Butler's house, about one hundred miles from New Orleans, and near the middle of the river; that when the Magnolia left Robertson's Landing the Autocrat was crossing from the head of Bayou Goula bar to the western bank of the river, with the view of prosecuting her voyage along that bank, aiming to come close to it, near Butler's house, and was, when first seen, nearly two miles from the Magnolia; that when the Magnolia commenced her movement this purpose of the Autocrat was discovered, and that her officers acted upon that conclusion, and that the fact that the Magnolia was a descending boat, was ascertained by those aboard of the Autocrat when she was a mile distant; that the course of the Autocrat was about midway between the west bank and the middle of the stream until the signal bell referred to in the libel was rung, and that her velocity was fully ten miles an hour. In reference to the signal bells, in comparing

the different accounts, my conclusion is that the bells were rung almost simultaneously, the Autocrat ringing hers first, but that the signal of the Magnolia was not rung as a reply, but that it was an anxious, convulsive movement, to warn the Autocrat of the imminent risk and peril of the course she was taking, and to admonish her to desist, rather than a response. I cannot understand the evidence of the officers of the Magnolia to bear any other interpretation. The pilot of the Autocrat furnishes the following explanation of his conduct: "They were pretty nearly a mile apart, when he made up his mind she (Magnolia) was a descending boat, from the way she was worked. It was then witness varied his course from the line leading to X, (a point on the map near Butler's and near the west bank,) and straightened the Autocrat up stream so as to give the descending boat room to pass on the right shore. If witness had not varied his course under this impression, and with the desire to give more room to the Magnolia, but had continued on to the letter X, he thinks the collision would not have taken place, as the Magnolia continued rounding out into the middle of the stream. But if he had gone to letter X, and she had continued down the river and kept the shore, as I supposed she would do, we would most inevitably have come together, and it was to avoid this that I diverted from the course to the letter X." We have here an explanation of the conditions in which the Autocrat was placed, the motives which they originated with her pilot, and the conduct which resulted. The testimony proves that the pilot misconceived the design of those who managed the Magnolia. This is shown by his own statement. He says "up to the time he rang the signal bell he thought the Magnolia was going into the right shore, but perceiving from her bow that she was leaving the bend, or the west bank, I rang the signal bell." He was also mistaken as to the mode in which the Magnolia was managed, and her rate of speed—for he "judges that both boats were running at the same rate of speed." These misconceptions require me to examine into the condition of the boat in reference to watches and assistance available to the pilot. The captain of the Autocrat was not on duty. The mate who supplied his place, "was sitting behind the chimneys," and was only aroused by the tapping of the bell of the Magnolia. He then came forward, but so little did the pilot profit by his presence, that he testifies the mate went below at this critical moment. There was a watchman in the pilot-house, but he seems to have said nothing. The mate and watchman, however, testify they had observed the Magnolia was moving on one wheel, and the engineer had no doubt, from her movements, that she was a descending boat. The inquiry will arise, whether the Autocrat, "which does not answer her wheel readily," was sufficiently supplied with efficient and active officers and men at this time. For the present, we will consider the facts contained in the statement I have quoted from this testimony. The course from which the pilot departed was certainly the correct one. He says, "the line witness has marked on the map, terminating at X, he would have run if the river had been entirely clear and he had no boats descending. That is the usual course for ascending boats of the Autocrat's size at the then stage of the water." The pilot, Paris, also of the Autocrat, says: "In running the river at the stage of the water at the time of collision, witness has been in the habit of holding a straight course from the head of Bayou Goula bar to the point above Butler's house, falling in to the left shore, ascending, about Butler's house, and this is the usual manner of running the river at that point at low stage of water."

These opinions are sustained, and the evidence of the practice supported, by the mass of the pilots who have been examined. This narrows the inquiry to an examination of the causes for the deviation in the circumstances of the particular case. The Magnolia had an equal right to pursue her voyage, and was subject to the same conditions as the Autocrat, to adopt the ordinary and reasonable precautions, which skill and experience had ascertained, to avoid disasters. When her officers came to the deck to arrange for their departure from Robertson's, they were to consider whether the necessary evolution of bringing her out and around, could be performed without crossing the track of the Autocrat, and without awakening a well-grounded apprehension of such a peril. The Autocrat was within sight, and had indicated her character as an ascending vessel. It is a favorable circumstance in the case of the Magnolia, that both her pilots were now on deck, and her movements were conducted at first under the observation of both, and also, that the captain was at his place and attentive to his duty. No doubt seems to have been felt by either of these experienced men, that they could bring their vessel to its proper place without peril; and the result shows that she performed her circuit and was in the middle of the stream when the collision occurred, and was nearly abreast of the point X, on the west bank, to which the Autocrat had been directed. In this connection the statements of the protest of the officers of the Autocrat and of the witnesses, to the place of collision, are important. There is, too, the confession of the pilot, that but for his deviation there would have been no collision. Was the movement of the Magnolia proper, and properly performed? It is a fact to be noticed, that neither in the protest, nor in the libel, nor in the testimony of the pilot of the Autocrat, who was on duty, is there any complaint of the departure of the Magnolia from the landing in the manner and

at the time it was performed. The attention of the pilot at the wheel was brought directly to the point, and his answers are clear and exculpatory. He says: "Witness would have done as the pilot of the Magnolia did to get her head down stream, from leaving the wood-yard." He describes the manoeuvre he would have executed, corresponding to that performed by the Magnolia. The pilot, Robb, of the Magnolia, says: "From what I saw of the collision, I believe the Magnolia was managed as well as she could have been. In descending the river at that point, boats keep in the middle of the river; the ascending boat, at that stage, crosses over into the bend, just above Bayou Goula, and runs the right shore for four or five miles. In saying everything was done that was proper, by the Magnolia, to avoid the collision, I say the engine was stopped ready to back, and the boat was in her right place in the middle of the river, and on her right course." The pilot, Duffey, examined for the libellants, says: "The proper course for an ascending boat, at Butler's, and for a mile above, is close in to the left shore, ascending; at Butler's, the descending boat should be about the third of the river from the Butler shore, with her head pointing about one hundred yards above Bayou Goula bar." The pilot, Scott, says: "The descending boat, about Robertson's wood-yard, ought to be in the middle of the river." Captain Thomasson, of the Magnolia, says: "The Magnolia was in about the middle of the river at the time of the collision, if anything slightly nearer the Butler shore, just in the position she would have been, as a descending boat, if she had not made a stoppage, except her head was pointing, &c., &c." The weight of the testimony is, that under ordinary circumstances, the middle of the river is the proper place for the descending boat at this place. But it sometimes happens that the descending boat, for business objects, or to take the bend below, crosses to the western bank, and in the present case a recollection of this influenced the pilot of the Autocrat. The allegation of the libel is, that the Magnolia was apparently going square across the river. The officers of the Magnolia disprove this allegation, and say there was no design to cross the river; that she moved with one engine, her larboard engine being at rest, and that they came around as quickly as possible, "rounding all the time," and were ready to go ahead when the diverging movement of the Autocrat was discovered, and then orders were given to stop the engines, which were promptly obeyed. The evidence is not clear as to the length of the circuit described by the Magnolia, nor as to the space required for this evolution; but there is reason to conclude that within two-thirds of the distance across the river it could be performed with facility, and was so on this occasion. Without any headway of consequence from the time the Autocrat took the alarm, we find the Magnolia, at the time of the collision, in the middle of the stream—her range to the west of that line could not have been a wide one.

Before proceeding to the complaint presented in the libel, I will notice the testimony of the pilots examined by the parties, and especially those by the libellants, relative to the management of boats and the customs of the river. I select the testimony of Capt. Swan, with the view of collecting about it the mass of concurring opinion that these depositions afford. 1st. He says: "If a steamboat upon a descending trip were at a wood-yard at night, and another boat should be coming up, and so near that a meeting would take place by the time the descending boat could make her rounding, it would be imprudent for the descending boat to start out or leave the shore. 2d. That he has frequently rounded out when there was an ascending boat in sight below him, but not when such boat was very near. 3d. Thinks, if a boat was within a mile of him, of a dark night, it would not be safe to round out. 4th. If a boat were more than a mile below, there ought not to be more danger from rounding out than from meeting a boat in a dark night. 5th. If a descending boat was rounding out, and had her head down stream, and a collision were to occur between her and an ascending boat, in a part of the river where the descending boat was in her proper place, and the ascending boat out of her proper place, witness does not think the fact of collision would be evidence of imprudence in the descending boat rounding out."

This testimony was given in the direct and cross-examination, and applies to the case I have examined. The witnesses generally lay down the first proposition as it is found in the foregoing statement. The imprudence of leaving the shore is ascertained by the test, "whether the boat would cross the line of the ascending boat's course;" and some of the witnesses used these words, (Allen and Clements.) Duffey says, "she ought not to leave unless she had time to round out, get across the river, and straighten down under headway, before meeting the ascending boat." A number of the witnesses, looking to the facts that the river at this place is wide, straight, and deep, with ample room for either boat to move in her appropriate track, without interference, find no reason for any restriction when a descending boat, under the circumstances, and say there is none in the daily management and conduct of boats. Without declaring any judgment upon this, my opinion is that the Magnolia did not fall under any of the restrictions found in the testimony of this witness, and those who agree with him. Upon his re-examination, the same witness (Swan) says, "he thinks it would be more proper in an ascending boat, seeing a descending boat leav-

ing and rounding out from Robertson's, to make for that shore, and for the descending boat to make for the other shore, and thus a collision would be avoided. This would be proper, no matter what, under ordinary circumstances, was the proper track of an ascending boat. 2d. But, if he were dropping in to the left bank, ascending, and he were to see a descending boat rounding out from the opposite bank, and so far round that her bow was pointing down in the direction of the ascending boat, but still rounding out, witness's boat being nearer the left shore than the right, he thinks the proper course for the ascending boat to avoid the collision would be to keep to the left shore."

These opinions are received with more hesitation by the body of pilots, and the weight of the opinion is, that the ascending boat would hardly be justified in leaving her appropriate shore, by the single fact of seeing a boat coming out. But if the ascending boat were to promptly pass to the shore left by the other, before the other came round, the chance of collision would probably be avoided. With this qualification, the opinion seems unobjectionable. The Autocrat did not cross to the shore left by the Magnolia. Her pilot, assuming that the Magnolia designed to cross the river at a point above him, made a provision for that contingency, but made none for the more probable contingency of her descent in the ordinary and usual manner. On the contrary, he took the measures which brought about the collision, when the contingency occurred. His testimony is, "the reason he indicated his intention to go to starboard was, that the Magnolia was at the time closer to the right bank, descending, than the Autocrat was, and he could not go to that shore without crossing her bows. When the Magnolia gave her signal, he does not think she was more than from three to five hundred yards distant. The Magnolia was coming round, when she rung her signal, and so continued until she struck the Autocrat. He did not know whether she was on one wheel or two, but he knows she never stopped." On his cross-examination he says: "Up to the time he rung the signal bell, he thought the Magnolia was going in to the right shore, (western,) but perceiving from her bow that she was leaving the bend or the right bank, he rung his bell, &c." At this time the Autocrat could not have been more than one-third, or perhaps fourth, of the width of the river from the western bank. The Magnolia was then rounding, and upon a single wheel, with but little headway, and, upon the sight of the Autocrat's movement, immediately suspended the action of her engine. The course of the Autocrat was direct to the opposite bank, and her velocity was great, yet she encountered the Magnolia in the middle of the stream. The Magnolia could not, within the time, have materially altered her position with respect to the opposite shores. The testimony of the captain,

mate, pilots, watchman. steward, and one passenger of the Magnolia, is, that they saw the approach of the Autocrat from the western bank. The pilot says: "When the Magnolia had got nearly round, and when deponent, who was at the wheel, had slacked her up, and was about to go ahead with the larboard engine, he perceived the Autocrat leaving the right bank, and coming towards the Magnolia. Deponent then, instead of going ahead, on the larboard engine, stopped the starboard, and rang both bells to back. The Autocrat was then heading towards the wood-pile we had left, and we were heading down stream. It was not more than a minute after deponent rung the engine bells to back, before the collision took place." The captain says, "that seeing this movement of the Autocrat, he exclaimed to the pilot to stop the engines and to back the boat, and that he rung the signal bell, and that the second tap of his bell, and the single tap of the bell of the Autocrat, were simultaneous." The statements of these officers are sustained by the evidence of witnesses on their respective boats.

I do not look for concordance in the statements of witnesses in these cases. Discrepancies must arise, in consequence of the excitement and alarm under which witnesses receive their impressions. Especially must we look with hesitation upon all statements in regard to time and distance, and in this case, the exact solution of the questions of fact materially depends upon evidence in regard to time and distance. This exhibition of the evidence is sufficient to enable me to declare the opinion I have formed upon the whole case. I am forced to the conclusion that an important cause which operated to produce this melancholy catastrophe, in which life and property were sacrificed, is that the Autocrat had not on duty a complement of efficient and attentive officers and men at this time. The character of the pilot is good, his testimony in the case is clear and frank, and, with competent aid, seems to have been adequate to the duties of his place. For any practical purpose, he was the only person in charge of the boat. The mate was where he could see nothing—the watchman said nothing—the captain was asleep in his room. The pilot having thus a large boat, running with great speed, not easy of management, commits a series of mistakes which have led to fatal consequences. When he ascertained the Magnolia was a descending boat, he supposed she was moving square across the river. He did not discover that she was moving only on a single engine; and at the last, when she was a sluggish mass, nearly stationary, supposes she was running with the speed of the Autocrat. I cannot but think that if he had obtained the information which an intelligent and responsible officer, stationed in front of the vessel,—[St. John v. Paine] 10 How. [51 U. S.] 557,—would have given, this calamity might not have taken

place. In the important case of The Mellona, 5 Notes Cas. 450, the judge of the admiralty court says: "With respect to the second proposition, I worded it very carefully, I asked the masters whether, if there had been a good lookout, there was a possibility that the collision might have been avoided; and the answer was, that such a possibility did exist; and I am of opinion, in point of law, that if there had been previous negligence, in not keeping a good lookout, then that party is responsible for all the consequences which might by possibility have been prevented. If, indeed, a party is to blame, but by no possibility whatever could injurious consequences have resulted from that culpability, then the court might not hold him responsible; but if a party is to blame in the manner in which it is now satisfactorily established this party was to blame, I hold that he is liable for the consequences, which by possibility, he might have prevented." The cases of The Iron Duke, 2 W. Rob. Adm. 378, and The Europa, 2 Eng. Law & Eq. 557, are to the same effect.

The supreme court of the United States—12 How. [53 U. S.] 443—employs, in the case of The Genesee Chief, a line of argument and a force of expression which are applicable to the circumstances of this, and the case of St. John v. Paine, 10 How. [51 U. S.] 557, has an important bearing upon it. In the navigation of the Autocrat there were two capital errors, which materially contributed to produce this disaster, and its fatal consequences. This boat was run in a dark night, at great speed, (some rating it as high as twelve and fourteen miles an hour,) at a time when a descending boat was visible, and the pilot at her wheel doubtful of the course she was taking. This pilot, testifying under the belief that the speed of the two boats was alike, says: "If the Magnolia had stopped, the collision would not have taken place." But the Magnolia was nearly stationary, and it was to the excessive celerity of the Autocrat that we must charge this misadventure, which left no time for prudential calculations, or for measures of evasion or escape. It is certainly true, that commerce has greatly profited from the energy and daring that are displayed in the steam navigation of the United States. But the convenience and profit of commercial men must be held subordinate to the security of life and property, and no prospect of commercial advantage can justify or excuse those who employ this great power in exposing incautiously to peril the lives and property confided to them. Under the circumstances, the pilot should have eased his engines or stopped his boat, until he was assured there would be no collision. 3 W. Rob. Adm. 75; 2 W. Rob. Adm. 202. Nor was the Autocrat justified in attempting to cross the river at the time her signal bell was rung. This manoeuvre was commenced when the circuitous movement of the Magnolia was

apparent, and her direction to the middle of the stream ascertained. The pilot (who seems to have discovered this after the engineer and watchman) then left the ordinary and usual track of vessels of this class, and in doing so, encountered a descending boat at her proper place in the river. There may be circumstances which suspend the rules and usages of navigation, and make a rule for the particular case; but the circumstances must be controlling. A pilot cannot depart from a rule upon a surmise, conjecture, or a speculation on probabilities. He assumes, in every case of a departure, to show a palpable necessity. If this were not so, there could be no confidence in navigation, no assurance to pilotage—perils would be increased, and security correspondingly diminished. The Flint, 6 Notes Cas. 271; The Gazelle, 5 Notes Cas. 101; 1 W. Rob. Adm. 471. The Magnolia, from the time her officers discovered the Autocrat to be an ascending boat, to the time the signal bells were rung, was managed with reference to the fact that the Autocrat had a track defined by the usages of the river navigation, which they were not to encroach upon. That this was not done, is apparent from the evidence already quoted. In the circumstances attending the use of the signal bells, which formed the gravamen of the complaint of the libellant, I can find no ground for a decree against the Magnolia. It is probable that the conduct of the officers at the time was injudicious; but conceding that a responsive affirmative of the signal of the Autocrat would have been preferable, in the facts of this case, the responsibility would not have been changed by this failure. The circumstances of peril were then imminent, creating apprehension and confusion of mind. The inquiry must be, whose fault was it that such conditions existed? A party who has involved himself and others in peril, cannot be heard to complain of their want of the clearest judgment in the selection of the modes of extrication.

Upon a careful examination of the testimony, I do not find the charges of ignorance, recklessness, or neglect of the rules of river navigation, made against the officers of the Magnolia, sustained. By remaining at the landing place, by the free use of signals and other measures of strict caution, which are always praiseworthy, the Magnolia might have avoided the catastrophe. She would thus, by extraordinary care, have been secured against the faults I have exposed in the management of the. Autocrat. But it would be unjust to give a sentence of condemnation for her failure to provide for remote and contingent dangers, arising from the errors of those who require the indemnity. The importance of this case, the sacrifices of life and property which so often occur in cases of this description, have led me to sift the questions of law and fact, which arise upon the record, and to expound

at length the doctrine of the court applicable to them. A firm and impartial enforcement. of these doctrines will serve to promote order and security in this vast department of the social economy, and give stability to the interests embraced within it. Decree of reversal; libel dismissed, with costs.

[On appeal to the supreme court the decree of this court was affirmed. 18 How. (59 U. S.) 463.]