### THE CITY OF MACON.

#### (Circuit Court of Appeals, Second Circuit. February 25, 1903.)

#### No. 97.

1. COLLISION—STEAMER STRIKING GROUNDED VESSEL.

The steamer City of Macon, passing down the Savannah river in the daytime, struck and injured the Teviotdale, which was aground across the center of the channel, but leaving room for other vessels to pass in safety. She had been aground for some time, and was known to be by those in charge of the Macon, who could see her for several miles. On approaching, the Macon's signal was answered by a cross-signal, from which the master of the Macon concluded, as he testified, that the Teviotdale was in motion. *Held*, that such conclusion was unwarranted, and did not relieve the Macon from the presumption of negligence arising from the collision.

2. SAME—DAMAGES.

A steamer solely in fault for a collision with another which was grounded is liable for all the damage resulting, although a large part of it might have been avoided by a different handling of the injured vessel after the injury was received, where those in charge exercised their best judgment, which was concurred in by the local pilot and tugmen.

Appeal from the District Court of the United States for the Eastern District of New York.

In Admiralty. Appeal from a decree of the District Court (100 Fed. 139) in favor of John R. Crooks, libelant, for the sum of $37,-744.11, damages for collision, against the steamship City of Macon. From this decree the Ocean Steamship Company of Savannah, owner and claimant of the City of Macon, duly appealed to this court.

Julien T. Davies and Herbert Barry, for appellant.
Henry Galbraith Ward, for appellee.

Before WALLACE, LACOMBE, and COXE, Circuit Judges.

COXE, Circuit Judge. On the afternoon of the 24th day of April, 1899, the British steel steamship Teviotdale, loaded and on her way to the sea, grounded in the Savannah river opposite the lower end of Elba Island, and from 6 o'clock until the time of the collision she was lying at right angles to the channel, or nearly so. The deep channel at this point is about 500 feet wide. The Teviotdale is 350 feet in length and 43 feet beam. At the time in question she was drawing 24½ feet forward and 24 feet 6½ inches aft. She was proceeding, until she took the ground, under her own steam and with the assistance of two tugs. At about half past 5 o'clock the Macon left Savannah bound for New York. She is about 300 feet in length and was drawing 16½ feet forward and 18½ feet aft. After executing a number of unusual maneuvers the Macon, at about half past 6 o'clock, collided with the Teviotdale, striking her 60 feet aft of her stem inflicting a wound which extended above and below the water line. The tide was at flood at the time of the collision, extreme high water being about an hour later.

The District Court found the Macon solely at fault and in this ruling we concur. There was no vis major, no disturbance of the elements, no fog or wind and no unusual condition which interfered in the least with the safe navigation of the river. It was broad daylight and a vessel could be seen plainly all the way from Savannah to Tybee Island at the mouth of the river. It is admitted that the Teviotdale was seen by the Macon from the time she left the city wharf until the collision occurred. Clearly, then, it is not a case of inevitable accident. In such circumstances, when a collision occurs, it is due to faulty seamanship. The Teviotdale being aground and helpless the presumption is that she was not responsible for the accident. The Granite State, 3 Wall. 311, 18 L. Ed. 179; The Louisiana, 3 Wall. 164, 18 L. Ed. 85.

Unless some act of omission or commission on the part of the Teviotdale is shown, which contributed to the injury, the Macon must be held alone responsible. The attempt to inculpate the Teviotdale because she blew one blast of her whistle is evidently a defense suggested by the exigencies of the litigation. Three days after the accident, when the subject was fresh in his mind, the master of the Macon made a written report to the local inspectors of steam vessels at New York in which he makes no mention of signals or of any negligent act of the Teviotdale, but attributes the accident to the sudden sheering of the Macon occasioned by her touching bottom. He says:

"I attempted to pass under slow headway when the Macon took bottom sheering for the Teviotdale. I immediately reversed engine to full speed back but could not check headway sufficiently to prevent the accident."

In his testimony he says that when between 400 and 500 feet away he blew two blasts to indicate that he was directing his course to port and intended to pass under the bow of the Teviotdale and that the latter answered with one blast, which induced him to think that she was afloat and was directing her course to starboard, and that in the confusion of the moment he swung to starboard and struck the Teviotdale. It is not easy to say from the proof just where the Macon was when the exchange of signals took place, but it is probable, in view of the admission of the answer that the vessels were half a mile apart at the time, that she was distant considerably more than 500 feet.

Even if the rules for signaling at sea were applicable to inland waters—and we do not intend to intimate that they are—it is clear that the Teviotdale's whistle, whenever given, could not have deceived the Macon's pilot as to the salient features of the situation. He knew that the Teviotdale was aground, that she was lying directly across the channel, that her propeller was not revolving, that she had not moved perceptibly during the entire time and that tugs were about her bow endeavoring to pull her off. The master of the Macon was an experienced seaman, conversant with the navigation of the river, and to assert that he supposed that the Teviotdale was under way is to attribute to him an inexcusable stupidity for which no foundation can be found in the evidence. A finding that he was ignorant of the true situation would convict him of being mentally incompetent and this he certainly was not.

Again, it is asserted that the Macon was caught in an eddy caused by the tide flowing around the bow and stern of the Teviotdale. If this were true it was a situation which an experienced pilot should have anticipated. It is quite probable that a large vessel, 350 feet long, lying across a channel 500 feet wide, with the tide running in, will produce some disturbance in the water; eddies would naturally be formed at her bow and stern, but this condition should have been foreseen and guarded against.

The problem presented to the Macon was not an unusually difficult one. Either she could pass safely or she could not. If she could not she should not have made the attempt, at least not until she had slowed down, or stopped if necessary, and acquainted herself with the exact truth of the situation. If, on the other hand, she could have proceeded safely—and that this was possible is demonstrated by the fact that several other vessels passed without mishap—it was her duty to proceed cautiously and not change her course and reverse when she was so near the Teviotdale that such maneuvers would inevitably tend to bring her into collision.

The master of the Macon does not deny that he could have avoided the collision. He says:

"I reversed my engine when within 300 feet of the Teviotdale. The effect of this was to throw the Macon's bow to starboard very fast, and counter-

act the wheel. I think the reversing of the propeller caused me to strike the Teviotdale. If I hadn't stopped I would have gone across his bow."

Upon the whole case we are forced to the conclusion that the misfortune of the Teviotdale in getting aground was not a fault and that the accident was caused solely by the negligence of the Macon.

## The Question of Damages.

The blow was not a severe one, the Macon was not injured at all, the Teviotdale's wound was about two feet long, its greatest width being about six inches. There was a crack above and below the aperture extending about 18 inches in each direction. About a foot of the opening was below the water line.

The commissioner awarded the libelant $32,645.71, which with interest and costs makes the aggregate of the judgment $37,774.11. That such a large award should result from so slight a wound seems astonishing and we enter upon the examination of this branch of the case with an inclination to reduce the damages if this can be done with justice to all concerned.

After the collision there was but a short time in which to act if the vessel was to be moved to a place where she could lie on an even keel, as only an hour elapsed before it was high water. A wound had been received the exact extent of which was unknown, the vessel was making water and as it was necessary to send to Savannah, seven miles distant, for competent machinists in order to make permanent repairs, only temporary repairs were possible during the period of high water. A serious question confronted the master of the Teviotdale; should he make the attempt to move his vessel where she would lie on a level bottom or leave her where she was? If he adopted the latter course there was danger that she might receive structural injury at low water and, on the other hand, she might fill and sink if she were moved into deeper water. We are inclined to think that he adopted the wiser course. Until the nature of the injury had been ascertained and the wound repaired prudence suggested that he should remain where he was. There can be no serious question as to the truth of this proposition. The next high tide was about half past 7 on the morning of the 25th.

The mechanics arrived from Savannah about five hours after the accident and immediately began the work of repair. In order to reach that part of the wound which was under water it was necessary to take out a portion of the cargo. The repairs were not completed until after high water on the morning of the 25th and at 8:30 that evening the Teviotdale was moved. Whether it would have been wise to have moved her on the morning tide presents the same problem which confronted the Teviotdale on the evening previous. In view of the serious strain received by her bottom on the 25th it is now probable that a large part of the damage might have been prevented had she been taken off on the morning tide. But this strain could not have been foreseen and if those in charge of the vessel exercised their best judgment in the emergency it is all the law required of them.

121 F.—44

As was said in the Magnolia, Fed. Cas. No. 8,958, 3 Am. Law Reg. 465:

"The inquiry must be, whose fault was it that such condition existed? A party who has involved himself and others in a peril cannot be heard to complain of the want of the clearest judgment in the selection of the modes of extrication."

The local pilot and the tugmen seem to have concurred with the master in thinking that it would have been bad judgment to float the vessel after the collision. That this could have been done, with an hour more of flood tide, we have no reason to doubt. That these men took what they thought to be the safest course, as each emergency arose, cannot be successfully disputed. They acted in good faith and we have looked in vain for proof of such palpable fault on their part as will release the Macon. The wound inflicted by the Macon was the proximate cause of all the damage received by the Teviotdale; but for that she would have proceeded on her journey to Hamburg.

We have in the collision a natural and obvious cause for all the subsequent disasters which befell the Teviotdale. The court is not justified in entering the realms of conjecture for the purpose of theorizing as to what might have been the result had the sequence of events been different after the blow was given. The collision is sufficient to account for it all.

The judgment of the district court is affirmed with interest and costs.