OLSEN v. LUCKENBACH et al. FICKETT v. SAME. TORKILSEN v. SAME.

(District Court, S. D. New York. January 14, 1916.)

1. TOWAGE &mdash;15(2)—Loss of Tow—LIABILITY OF TUG.
  A tug with two coal-laden barges in tow December 24th passed the Delaware Breakwater bound for Providence, R. I. Weather conditions were not favorable. After proceeding up the coast for about 100 miles, the wind having freshened into a gale from the northeast, with a heavy sea the master, believing that he could not weather it, turned back for the breakwater. It was then dark, and he could not afterward see the barges. The wind having shifted more to the eastward, and finding that they were drifting toward the coast, he signaled the barges to cast loose and anchor, but received no answer, and from the direction and force of the wind and the length of the lines it is probable that his signals were not heard. Later, finding the tug being driven into the breakers, to save her he cut the hawser. The barges were wrecked on

the coast, and the crews lost. *Held*, that the evidence was not sufficient to convict the master of negligence in acting as he did in the crisis which confronted him, or to render the tug liable for the loss of the seamen.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 34–36; Dec. Dig. ☞15(2).]

2. TOWAGE ☞11(1)—LOSS OF TOW—LIABILITY OF TUG.
A standard of prudent conduct for the handling of a tow in a storm at sea, set up after the event by one who was not present, although a navigator of experience, must be regarded with the greatest caution as a criterion of legal obligation.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11, 14, 16, 21; Dec. Dig. ☞11(1).]

In Admiralty. Suits by Christine M. Olsen, administratrix of the estate of Olaf Olsen, deceased, by Susie M. Fickett, administrator of the estate of William B. Fickett, deceased, and by Sarah H. Torkilsen, administratrix of Hans Torkilsen, deceased, against Edgar F. Luckenbach and John W. Weber. Decree for respondents.

Charles A. Ludlow, of New York City, for libelants.

William A. Jones, Jr., of New York City (Nelson Zabriskie and Peter Carter, both of New York City, of counsel), for respondents.

AUGUSTUS N. HAND, District Judge. The Edgar F. Luckenbach had in tow the schooner coal barges A. G. Ropes and the Undaunted. These barges carried over 5,000 tons of coal. The tug drew about 17 feet of water, and the barges about 27 feet of water. The tow passed the Delaware Breakwater about 4 o'clock December 24th, bound for Providence, R. I. There is no proof that weather conditions were not satisfactory, and, indeed, it is now practically admitted by all concerned that the captain was justified in putting out with his tow at the time he did. As he proceeded up the New Jersey coast the wind freshened, and by 4 o'clock on December 25th a gale from the northeast was blowing and a large sea running. About 9 o'clock the captain decided that he could not weather the storm, and made up his mind to turn back and return to the Delaware Breakwater, which was about 100 miles to the south. He has testified that the wind was blowing so hard from the northeast that he could not turn his tug and the tow to the starboard, so he turned to port. The place where he turned about was off Sea Girt, N. J. The captain in his deposition said:

"I put the wheel hardaport and tried to work her around to the eastward, but couldn't work her to it. The sea was running on her starboard side; she wouldn't work head to it. I put the wheel hardastarboard, and came around on the starboard wheel, turned her in shore to the westward. After I got turned around south-southeast, sounded and had 14½ fathoms of water strong. The wind was northeast. After I got turned around I headed her out. Continued on that course on down, trying to get to the Breakwater, or run far enough to the southward out of that, or until we got better weather. After I got down probably 10 miles more, the wind backed around again east on me, and kept on breezing up all the time. Around 11 o'clock I found out I couldn't do anything with the two barges. I say it was a little after 11, around 11; and I blew signals 'Prepare to anchor,' and I went probably 15 or 20 minutes, and I blew 'Head barge let go stern barge,' and then blew

'Let go anchor.' I never received no response, and I couldn't see them, and I couldn't tell what they had done, or whether they had let go. I never saw the barges from 6 o'clock at Sea Girt. I saw the barges then, and they were all right. They had no distress signals up then whatever, and after I turned around I only saw Sea Girt possibly 15 minutes to the longest. Just a little lull came and I could see the Light; it cleared it up, and it showed pretty bright then. After I turned around and got down as far as I did, it kept breezing on and breezing on, and I found out I was going sideways faster than I was going ahead. At 12 o'clock I blew them again 'Prepare to anchor,' but got no response from them at all. It was blowing hard and the sea was running high all the time, and we got in further all the time; but we hadn't got in further than 13½ fathoms. We got that up to 1 o'clock. * * * After 1 o'clock, shortly after 1 o'clock I had the mate sound again, and he sung out 12 fathoms of water, and at 1:20 or 1:30, I believe it was, he shouted out 9 fathoms of water, and just as he shouted out 9 fathoms of water, why I saw a light ahead of me, and by the bearing of that light I knew where I was at, and I shouted out, 'Cut the hawser,' and he cut the hawser, because I knew we were in the breakers, because one breaker had gone over us already. * . * * Just as he cut the hawser we ran into another breaker, and I knew we were just as near in as I dare get without risking the lives of the 17 men and the tugboat. * * * If it was blowing a mile, it was blowing 70 miles an hour, and the sea was running very high. * * * "

After the hawser was cut, the barges, with the men on them, were dashed to pieces on the New Jersey coast, and these libels are filed by the widows of three of the crew of the barges to recover damages from the owner of the tug for negligent navigation.

[1] The libelants have been unable to obtain any testimony, except from the respondents' witnesses and the entries in the log of the tug. There consequently can be and is little, if any, dispute about the facts, and the libelants have been obliged to rest their case upon criticism of the navigation of the master of the tug (as disclosed in the log) made by an expert, Capt. McGoldrick, who has had very large experience in coastwise navigation of a similiar sort, and made a most favorable impression upon me as a fair and reliable witness. The gist of the criticism of the captain of the tug is that he should have anchored the tug and the coal barges when he found he could not proceed further to the northeast; that it was exceedingly dangerous to turn in such a storm, where there was not lee room of more than 10 or 12 miles, whereas standing to in the storm was comparatively safe, in view of the extra heavy anchors carried by the coal barges. A further criticism is made of the captain of the tug because he did not anchor after he had turned, when he found that he was continually drifting eastward, and the soundings during four hours after he turned at 9 o'clock in the evening showed that he was nearing the New Jersey shore.

Perhaps I should take up the second criticism first. The captain of the tug says that he blew signals to the barges to anchor at about 11 o'clock. It is obvious from the testimony that this was a hopeless expedient, because the nearest barge was about 1,200 feet astern of the tug, and the second barge was 1,200 feet behind the first one. It is most unlikely that the sound of a steam whistle could be heard against a roaring gale that was blowing, according to the testimony, not toward, but from the direction of, the barges, at the rate of upwards of 60 miles an hour. Undoubtedly, if the tugs had heard, they would have anchored, or at least answered, and their whistles, coming from the

windward side of the tug, should have been heard by its captain. Whether or not the idea of the captain was correct that he could not hold both of them, even when anchored, and that the last barge must let go, need not be considered, for apparently, under the existing conditions, the whistle of the tug could not be heard, and he insists that the tug could not safely go back, when such a gale was blowing, to a position nearer the barges, where he could rescue the bargemen, or make his whistle heard. I cannot say that this was not so, and therefore pass over this second criticism of the captain's navigation upon the ground that, after turning, the only thing he could attempt was to keep off the shore, and, if he found that failed, endeavor to blow the barges to anchor. These things he did. If he is incorrect in saying that he was in the breakers when he cut the hawser, yet he was drifting so rapidly that the soundings had changed from 12 to 9 fathoms in half an hour. With the high wind blowing, and the barges far nearer the shore, the whole tow would soon be in the breakers, and the danger was terrible and imminent.

In regard to the first criticism of the captain's navigation, I do not feel certain that it may not be well founded. It has been pressed with earnestness and ability by the libelants' counsel, and indeed, considering how little evidence was available on his side of the case, owing to the disappearance of the entire crew of the barges, I have felt that he has made a wonderfully strong argument under all the circumstances. It is to be remembered, however, that at the time the tug turned the tow the wind was not blowing eastwardly, but northeastwardly. I do not think, under these conditions, that the libelants have established that the captain was negligent in attempting to turn his tow and go before the wind, or that the wind was at the time so directly shoreward as to make his attempt ill-advised. If he had succeeded, all would have thought him a wise navigator. He had a difficult decision to make in a crisis, and, while I may doubt the correctness of his judgment, I cannot say that, under all the circumstances, he made it negligently or improvidently. He was undoubtedly bound to be loyal to the bargemen, to bear in mind that the hawser which bound the barges to the tug was almost their only hope in that storm, which was carrying tug and tow constantly nearer to the New Jersey coast, and in general to act the part of a prudent navigator and a brave man. After reading his explanation of his conduct, I cannot feel justified in pronouncing his decision improvident and reckless, because of the opinion of an expert.

[2] In the first place, even if the facts assumed by the witness, and no others, fully represented the real events, the opinion does not carry clear conviction to my mind; and, in the second place, it is based upon hypotheses as to conditions of wind and waves, and not upon the tremendous realties of that particular storm, with which the master of the tug had to deal. It is easy for any man of experience, or indeed without experience, to criticize the conduct of another in a great crisis; but a standard of prudent conduct, set up after the event by one who was not present, must be regarded with the greatest caution as a criterion of legal obligation. No substantial relief can, I think, ever be found for the men who now risk their lives in the coasting trade upon vessels

which have no motive power aboard until Congress shall see fit to require steam or sail power on all vessels in the coasting trade, and to forbid men to be sent or to go upon the ocean in barges which have no motive power of their own, and have too great bulk and weight to be controlled in a storm by a tug and a hawser.

After careful consideration, I have reached the conclusion that the libelants have not sustained the burden of proof in establishing that the captain of the tug was negligent, and I therefore direct that the libels be dismissed.