14 F.2d 100 (1926)
THE WALTER A. LUCKENBACH.
UNION OIL CO. OF CALIFORNIA et al.
v.
LUCKENBACH S. S. CO. Inc.
LUCKENBACH S. S. CO. Inc.,
v.
UNION OIL CO. OF CALIFORNIA et al.
No. 4825.
Circuit Court of Appeals, Ninth Circuit.
July 12, 1926.
Farnham P. Griffiths, Russell A. Mackey, and McCutchen, Olney, Mannon & Greene, all of San Francisco, Cal., for appellants and cross-appellees Union Oil Co., Olai Olsen and others.
S. Hasket Derby, Carroll Single, and Joseph C. Sharp, all of San Francisco, Cal., for appellant and cross-appellee Shell Co. of California.
William Denman and William B. Action, both of San Francisco, Cal., for appellants and cross-appellees Insurance Co. of North America and other insurers.
Louis T. Hengstler and Frederick W. Dorr, both of San Francisco, Cal., for appellee and cross-appellant Luckenbach S. S. Co.
Before GILBERT, HUNT, and RUDKIN, Circuit Judges.
RUDKIN, Circuit Judge.
On the afternoon of October 7, 1922, the steamship Walter A. Luckenbach came into collision with the oil tanker Lyman Stewart, off Fort Point in the Golden Gate, in a dense fog. At the time of the collision the Luckenbach was entering the harbor of San Francisco on a voyage from New York and Philadelphia to San Francisco, Portland, and Seattle. She passed the lightship off the Golden Gate at 2:25 p. m. that afternoon, and proceeded full speed ahead until she reached Mile Rock, about two miles from the place of the collision. She arrived at Mile Rock at 3:06 p. m., and proceeded thence at half speed until 3:19 p. m., when she encountered a strong eddy or rip tide near Fort Point. There the port engine was given full speed ahead and the starboard engine full speed astern, to straighten her on her course. This movement had scarcely been accomplished when the Luckenbach sighted the Stewart coming almost head on, going *101 out to sea, not more than 300 or 400 feet away. The collision followed immediately thereafter. After the collision the two vessels remained together until 3:29 p. m., when they drifted apart. Both vessels were considerably damaged by the collision, but by far the greater damage was suffered by the Stewart. The Luckenbach struck her on the port bow abaft the stem and plowed in as far as the windlass, the gash extending both above and below the water line. The Stewart began to fill very rapidly.
After separating, the two vessels drifted back toward Mile Rock until 3:46 p. m., when the master of the Luckenbach received a message from the master of the Stewart asking for a line. As the master of the Luckenbach was reading the message, the steamship F. S. Loop came alongside and asked if he needed any assistance. The master of the Luckenbach replied that he did not, but directed him to stand by the Stewart, as he thought she was sinking. The Luckenbach then left the scene of the accident and proceeded into port. The Stewart drifted down toward Mile Rock, with the Loop hovering in the vicinity. At 4 p. m. the engines of the Stewart were started slow astern, at 4:05 they were stopped, and at 4:10 the vessel settled down on the rocks and became to all intents and purposes a total loss.
Thereafter the owner of the Luckenbach filed a petition for limitation of liability, and a libel for damages against the Union Oil Company, as owner of the Stewart. We deem it unnecessary to set forth in detail the different answers filed and claims made, further than to say that all proceedings affecting the two vessels were consolidated for the purpose of trial, and that by its final decree the court below adjudged: First, that both vessels were in fault and that the damages should be divided; second, that the damages recoverable by the Stewart and her cargo should be based on the condition of the vessel and her cargo immediately following the collision, and should not include damages caused by the subsequent stranding, and loss of vessel and cargo; third, that the value of the fuel oil, deck, engine room, and other stores on board the Luckenbach should be included in the appraised value of the vessel, for purposes of limitation of liability; and, fourth, that the owner of the Luckenbach was not entitled to recover certain costs, the principal item of which was a premium of $8,000 paid for the bond given by it in order to obtain a release of the vessel in the limitation proceedings.
The Luckenbach Steamship Company, as owner of the Luckenbach, has appealed from that part of the decree adjudging both vessels in fault and dividing the damages; from that part of the decree including the value of the fuel oil, deck, engine room, and other stores in the appraised value of the vessel for purposes of limitation of liability; and from that part of the decree denying a recovery of the costs claimed by it. The Union Oil Company, as owner of the Stewart, the Shell Company of California, as owner of part of her cargo, and certain insurance companies, subrogated to the rights of another cargo owner, have appealed from that part of the decree limiting the recovery by the Stewart and her cargo to the damages sustained by the Stewart in the collision, and denying a recovery for damages caused by the subsequent stranding and for loss of vessel and cargo.
We will take up these several questions in the order named. At the time and place of the collision the two vessels were in a narrow channel leading into a busy harbor; the fog was so dense that in the opinion of the court below visibility did not exceed two ship lengths, and in our opinion the finding is more favorable to the vessels than the testimony will warrant, for we doubt very much whether either vessel saw or could see the other for a greater distance than from 300 to 500 feet. The Luckenbach was proceeding against an ebb tide at a speed of from 9 to 10 knots through the water, and from 5 to 6 knots over the ground, while the speed of the Stewart with the ebb tide was from 5 to 6 knots through the water and from 9 to 10 knots over the ground. The lookout on the Luckenbach was stationed 100 feet back of the bow, 30 feet above deck, and approximately 55 feet above the water. Such are the findings of the court below, and these findings are amply supported by the testimony.
We are not now concerned with the fault of the Stewart, nor is it very material whether she was on the right or wrong side of the channel, because at the rate of speed at which the vessels were traveling in a dense fog a collision was inevitable, if they attempted to cross the same course at the same time; and, under the circumstances, it is very apparent that the Luckenbach did not maintain a proper lookout. A lookout stationed 100 feet back of the bow, while the vessel was passing in a dense fog through a narrow channel leading to a busy harbor, did not satisfy the requirements of the law. Perhaps, as stated by the court below, the result *102 would have been the same if the lookout had been advantageously placed; but it always comes with ill grace for a vessel charged with failure to maintain a proper lookout to answer that her rate of speed was such that a lookout properly stationed would be powerless to protect her against a disaster such as this. The decree as to mutual fault and division of damages is affirmed.
In the original opinion filed in the case, the court below expressed a strong conviction that the ultimate loss of the Stewart and her cargo was attributable, not to the collision, but to the failure of the master to take proper steps for their preservation after the collision occurred; but, notwithstanding his personal convictions, the court divided all damages, in deference to the views of counsel, believing that the proctors for the Luckenbach had by their silence abandoned any claim that the loss of the ship and cargo was caused by the action or inaction of the master after the collision, and not by the collision itself. This opinion naturally led to a motion for its modification, which was later granted. The reasons which prompted the court to modify the decision are thus stated:
"In smooth water, one third cargo, flooded only forward, and down by the head little more than if full cargo, a low main deck, partly awash forward, but lifted by jettison of cargo, bow, forward deck, and forecastle eight feet or more above main deck, engines in order, and men standing by to work them, anchors likewise, two vessels timely ready to give or take a line, the Stewart in a 3 or 4 knot current was permitted to drift like a helpless derelict for two miles, along an eddy of safe anchorage, and to end upon known rocks, without a turn of a wheel, until too late to save her, and without letting go a single anchor." 4 F.(2d) 551.
It may be assumed that the water was smooth, except for the ebbing tide; but the statement that the vessel had but one-third cargo is not borne out by the record. Her condition in that regard was not an issue upon the trial, but such testimony as was offered tended to show that all cargo tanks were full, except No. 1; that the capacity of the tanks was about 9,000 barrels each; that tank No. 1 contained about 2,500 barrels; that the entire cargo consisted of 72,000 barrels or 10,500 tons, and in numerous hypothetical questions the proctors for the Luckenbach assumed that the vessel was fully or heavily loaded.
As to the condition of the Stewart: It was conceded that she was cut through, both above and below the water line, and was filling rapidly. Her bow was under water as far back as the bridge, and this condition was relieved but little by pumping oil from the cargo tanks. Her opportunity to take a line from either vessel was by no means clear. The master of the Luckenbach testified that it would take at least an hour to extend a line from his vessel, and the Stewart was stranded well within that time. Furthermore, when asked for a line, he proceeded into port and left the Loop to stand by. According to the more definite and credible testimony, the Loop appeared on the scene just as the master of the Luckenbach was reading the message from the Stewart at 3:46, and whether the Loop remained two minutes, or five minutes, it is safe to say that she was in no position to render aid before 3:50. The engines of the Stewart were put astern at 4 o'clock, and it is conceded on all sides that the time for giving aid had then passed. It will thus be seen that the Loop had but 10 minutes within which to extend a line to the Stewart, and it would have taken all of that time to do so under the most favorable conditions.
The master testified that he was afraid to go ahead on his engines, lest it would drive his ship to the bottom of the sea, and that he was afraid the like result would happen if he dropped anchor in the swift current. He therefore deemed it the safer and wiser course to permit his vessel to drift out to still water and a safe anchorage in the open sea until succor came. Pursuing this course, he drifted out until abeam of Mile Rock, where the engines were put astern to turn the stern of the vessel to port. But, instead of responding in the customary way, the stern of the vessel turned to starboard and to ultimate destruction. The reason for this was apparently the fact that the ship was down at the bow and did not respond to her engines in the usual way. In fine, the master and his officers testified that the course pursued was deemed the safer and more prudent one under the circumstances; they did not think that the master could proceed forward or anchor in safety; they did not think that he could safely take a line from the Loop; they did not think that he could do otherwise than he did. The masters, and some of the officers of the Luckenbach and the Loop, were of a different opinion; but, if the responsibility was theirs, they might have guessed better, and they might have fared worse.
The question then arises: Is the master to be condemned? The problem confronting *103 him was a problem of the sea, to be solved in the first instance by seafaring men. We should not view the situation in retrospect or from the shore, but from the viewpoint of the master on the bridge of the crippled ship, charged with full responsibility for her safety and for the safety of her cargo and crew; and, when viewed in that light, we must not only be able to say that the course pursued was wrong, but we must be further able to say that it was so illy considered and so plainly wrong that a competent navigator would have rejected it, if placed in the like position. The master of the Stewart may have erred in the measures adopted to extricate his vessel from the perils in which she was placed by the collision, but, if he did, it was in our opinion an error of judgment only, such as any competent navigator might have committed under the like circumstances.
The court below held that the burden was upon the Stewart to prove the exercise of due care and diligence to protect the vessel and cargo after the collision and to mitigate further damages, and its ultimate conclusion may have been influenced to some extent by that ruling. The Clara, 102 U. S. 203, 26 L. Ed. 145, cited by the court, does not support the ruling made, as the question before the court in that case was one of original fault. A rule contrary to that stated by the court is well settled in the English courts at least, and it would seem in the courts of this country as well. Thus, in The Mellona, 3 W. Rob. 7, the court said:
"Prima facie, gentlemen, the presumption of law is that the vessel was lost in consequence of the collision. In all questions of this description, this is the prima facie presumption; and great indeed would be the inconvenience, and still greater the difficulty, if, in all cases of this kind, where the vessel did not go down immediately, but was subsequently lost, the court had to enter into an investigation whether all the measures adopted on board the damaged ship were right, or whether, if other measures had been pursued, the vessel might not have been saved."
See, also, The Pensher, Swab. 211; The Linda, Swab. 306; 11 C. J. 1165, and cases there cited.
But, regardless of any question of presumptions or burden of proof, our conclusion would be the same, for, as said by Mr. Justice Campbell in The Magnolia, Fed. Cas. No. 8,958:
"The circumstances of peril were then imminent, creating apprehension and confusion of mind. The inquiry must be: Whose fault was it that such conditions existed? A party, who has involved himself and others in peril, cannot be heard to complain of their want of the clearest judgment in the selection of the modes of extrication."
In The City of Macon, 121 F. 686, 58 C. C. A. 434, the court said:
"The local pilot and the tugman seem to have concurred with the master in thinking that it would have been bad judgment to float the vessel after the collision. That this could have been done, with an hour more of flood tide, we have no reason to doubt. That these men took what they thought to be the safest course, as each emergency arose, cannot be successfully disputed. They acted in good faith, and we have looked in vain for proof of such palpable fault on their part as will release the Macon. The wound inflicted by the Macon was the proximate cause of all the damage received by the Teviotdale; but for that she would have proceeded on her journey to Hamburg. We have in the collision a natural and obvious cause for all the subsequent disasters which befell the Teviotdale. The court is not justified in entering the realms of conjecture for the purpose of theorizing as to what might have been the result had the sequence of events been different after the blow was given. The collision is sufficient to account for it all."
See, also, The Frostburg (D. C.) 25 F. 451; The Gladiator, 79 F. 445, 25 C. C. A. 32; Olsen v. Luckenbach (D. C.) 238 F. 237; The Mary T. Tracy (D. C.) 298 F. 528; The Mary T. Tracy (C. C. A.) 8 F.(2d) 591.
For the foregoing reasons, we are of opinion that the original decision of the court was correct, and that its modification was error.
The ship's stores were properly included in the appraised value of the vessel. As said by the court in Main v. Williams, 152 U. S. 122, 14 S. Ct. 486, 38 L. Ed. 381:
"The real object of the act in question was to limit the liability of vessel owners to their interest in the adventure; hence, in assessing the value of the ship, the custom has been to include all that belongs to the ship, and may be presumed to be the property of the owner  not merely the hull, together with the boats, tackle, apparel, and furniture, but all the appurtenances, comprising whatever is on board for the object of the voyage, belonging to the owners, whether such object be warfare, the conveyance of passengers, goods, or the fisheries."
*104 The stores were "on board for the object of the voyage" and were properly included in the appraisement. Whether appraised separately or as a part of the ship is immaterial, so long as they were appraised but once.
The order of the District Court provided: "That the petitioner have and recover from claimants the taxable costs of the actual trial of the issue of the right to limitation of liability, the same not to include any costs incurred prior to the issuance of the monition herein."
The petitioner was required to surrender the vessel, or give stipulation for or pay the amount of the appraised value into court, in order to obtain the benefits of the statute, and should bear all the expenses incurred in so doing. The costs of the trial of the issue relating to the limitation of liability were neither increased nor diminished by the contest of that issue, and the order of the court in the premises was proper. The W. A. Sherman, 167 F. 976, 93 C. C. A. 228; Boston Marine Ins. Co. v. Metropolitan Redwood L. Co., 197 F. 703, 117 C. C. A. 97.
The conclusion we have reached on the merits obviates the necessity for any consideration of certain other questions discussed by counsel for the cargo owners in their briefs.
The decree of the court below will be so modified as to conform to the original opinion of the court, and, as thus modified, it stands affirmed.