## THE ALGONQUIN.

### Petition of CHEROKEE–SEMINOLE S. S. CORPORATION et al.

District Court, S. D. New York.
July 28, 1933.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and A. Howard Neely, both of New York City, of counsel), for petitioners.

Bigham, Englar, Jones & Houston, of New York City (Leonard J. Matteson, of New York City, of counsel), Carter, Ledyard & Milburn, of New York City (Rush Tag-

gart, of New York City, of counsel), Single & Hill, of New York City (Alonzo L. Tyler and C. Welmore Robinson, both of New York City, of counsel), George Z. Medalie, U. S. Dist. Atty., of New York City (Charles E. Wythe, of New York City, of counsel), Bailey & Muller, of New York City (William H. Woolley, of New York City, of counsel), Park, Lynch & Hagen, of New York City (Anthony V. Lynch, Jr., of New York City, of counsel), Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (William H. McGrann, of New York City, of counsel), for claimants.

COXE, District Judge.

This is a petition to limit the liability of the steamship Algonquin with respect to damage claims arising out of a collision with the steamship Fort Victoria at the entrance to New York Harbor on December 18, 1929. The collision occurred at 3:50 p. m., in a dense fog, in the vicinity of the Fairway Buoy, outside Ambrose Channel; and four hours later, after the passengers and crew had been safely removed, the Fort Victoria sank, and became a total loss.

The right of the petitioners to limit is admitted. It is conceded, also, that the Algonquin was solely at fault for the collision; and counsel for the petitioners stated at the opening of the trial that the claim of the owner of the Fort Victoria had been settled; so that the only claims still left open for consideration are for loss of cargo and personal effects of passengers and crew of the Fort Victoria; and with respect to these latter, the petitioners assert that the damage resulted, not from the collision, but from the negligence of those in charge of the Fort Victoria, in failing to beach the vessel during the four hours which elapsed after the collision, and prior to the sinking.

The petitioners allege, in paragraphs sixth, seventh, and eighth of the petition, that the damage to the Fort Victoria "by reason of contact with the Algonquin was not in itself severe or vital"; and, further, that "leakage into the Fort Victoria" resulted from the failure promptly to close the water tight bulkheads, or to use a collision mat; that there were unnecessary delays "in the weighing of her anchor and/or the slipping of her chain * * * or by defective appliances and apparatus"; and that "the Fort Victoria, her cargo and effects were prematurely abandoned," and "those responsible * * * failed to exercise reasonable exertions either to raise the vessel or to save the contents." At the trial, the petitioners placed little reliance on these specific allegations, but asserted broadly that those in charge of the Fort Victoria were negligent in refusing the offered assistance of the wrecking tug Columbine; and that if such assistance had been promptly accepted, it would have been possible to have beached the Fort Victoria in shoal water while she was still afloat, and, in that way, to have saved, or at least to have minimized the damage to, the cargo and personal effects of passengers and crew.

When testimony was first offered by the petitioners with respect to the asserted refusal to accept the assistance of the Columbine, objections were made by the claimants that the proof was not within the allegations of the petition; and at the close of the trial a motion was made by the petitioners to conform the allegations of the petition to the proof. This motion was taken under advisement; and in view of the fact that surprise was neither asserted nor claimed in so far as the Columbine was concerned, and the issue has been fully litigated, I can see no good reason why the case should not be disposed of on the merits. The motion of the petitioners to conform the petition to the proof is accordingly granted.

On the merits, the claimants insist: (1) That those in charge of the Fort Victoria were not guilty of negligence subsequent to the collision; (2) that even if there were such negligence, it was not of such a nature as to break the causal connection between the collision and the loss sustained by the claimants, or sufficient to meet the severe burden resting on the petitioners to show that the damage resulted from some cause other than the collision; and (3) that the present claimants are not responsible for any intervening negligence by those in charge of the Fort Victoria.

The Fort Victoria was a steel vessel built in 1913; her length was 411.7, breadth 56.7, depth 34.1; gross tonnage 7,784; net tonnage 4,532. She left New York at 11 a. m. December 18, 1929, drawing 20′ 11″ forward and 22′ 6″ aft, bound for Bermuda, with 246 passengers, 168 officers and crew, and a general cargo of merchandise. The Algonquin is also a steel vessel, built in 1926, having a gross tonnage of 5,945, net tonnage of 3,546, length 387.5, breadth 55.2, depth 20, and 4,200 indicated horse power. At the time of the collision, she was on a voyage from New York to Miami and Galveston with passengers and cargo.

The Fort Victoria proceeded slowly down the Bay through intermittent fog, and

at about 3:45 p. m. stopped to discharge her pilot about one-fourth to one-half of a mile S. E. of the Fairway Buoy, outside Ambrose Channel. The pilot boat New York had arrived and taken a position off the Fort Victoria's port bow. The fog was extremely dense, and the Fort Victoria was stopped dead in the water, and blowing the regulation fog signals. The pilot, Fendt, was about to leave the vessel, when through the fog, and without warning, the Algonquin suddenly appeared, and crashed into the Fort Victoria on her port side about amidships, at almost right angles.

The speed of the Algonquin was variously estimated at from 10 to 12 knots, and her bow ripped into the hull of the Fort Victoria a distance of 8 to 10 feet at the height of the promenade deck; the opening at that point being about 5 feet wide. Below the water line, there was a large circular hole in the shell, through which the water poured into the boiler room, putting the engines immediately out of commission, and causing the vessel to list sharply to starboard. The boiler room filled quickly, but the water-tight doors between the boiler and engine rooms were promptly closed, and the chief engineer reported to the bridge that the boilers were finished, but that the vessel would probably float, provided the bulkheads held.

Captain Francis, who was on the bridge with pilot Fendt, thought from the first that the Fort Victoria "would possibly sink"; and, after the starboard anchor had been dropped to prevent the vessel from drifting to sea, or colliding with other vessels, orders were given to man the lifeboats; and thereupon the passengers and crew were disembarked into lifeboats, except a skeleton crew of 13 to 16 men left on the vessel. This was accomplished by 4:48 p. m., but it was not until 5:45 p. m. that the last lifeboat was picked up, and the passengers and crew safely transferred to the pilot boats New York and Sandy Hook, which were standing by to render assistance.

In the meantime, the Algonquin had backed away from the Fort Victoria and anchored, but there did not appear to be any help she could give in transferring the passengers and crew; and she at no time offered to tow the Fort Victoria to shoal water. There was testimony also that the Favorita, an outgoing vessel, 274.5 feet in length, breadth 36, depth 13.8, and 1,676 gross tonnage, came alongside the Fort Victoria at 5:05 p. m., and offered assistance, but was told that the passengers had been taken off, and that assistance was not required.

After the passengers and most of the crew of the Fort Victoria had left the vessel, the skeleton crew of 13 to 16 officers and men remaining gathered in the forepart of the ship and proceeded to make the vessel ready for towing. In the meantime, the New York had been advised by the pilot, Fendt, to stand by to take a line to tow the Fort Victoria to shoal water; and while the lifeboats were being picked up by the New York and the Sandy Hook, the New York was being prepared for towage.

On the Fort Victoria, the skeleton crew worked under extreme difficulty to get the 8-inch lines, 90 fathoms in length, out of No. 2 hold, and to the forecastle head; for there was no steam to operate the windlass, it was dark, the decks were wet and slippery, and the vessel had a considerable and increasing list. Finally, one of the 8-inch lines was hauled into place, and, with the assistance of a yawl from the Sandy Hook, passed to the New York, which, in the meantime, had come alongside; thereupon an attempt was made to clear the anchor chain, but it refused to run, and no place in the chain was available for knocking out the shackle pin. Then, after various efforts to release the shackle had failed, it was decided to cut the chain, and Parker, the second engineer, produced a hack saw, with which he sawed through one of the chain links, the entire operation taking about 23 minutes to perform.

The line to the New York was already out, and when the chain had been severed, the New York commenced immediately to tow the Fort Victoria towards shoal water, about 2½ miles to the northwestward between Ambrose and Gedney Channels. According to the New York's log, it was 6:40 p. m. when the towing started, and the tide at that time was flood, with a current velocity of about .6 knots. At first, the New York had difficulty in getting into position, but that was quickly remedied, and the towing proceeded until 7:05 p. m., when the hawser parted. A new line was thereupon passed, and the New York began again to tow at 7:30 p. m., continuing until 7:45 p. m., when the Merritt-Chapman wrecking tug Relief arrived, and took the hawser from the Fort Victoria. Five minutes later, or at 7:50 p. m., after the Fort Victoria had been towed about a mile from the place of collision, the vessel rolled over on her side, filled, and sank.

Just prior to the sinking, the members of the crew of the Fort Victoria remaining on the vessel were taken off by the Columbine, which had been standing by at the request of Captain Francis; and as the Fort Victoria

went down, the Columbine came head on to her bottom, and, throwing a line to Captain Francis and pilot Fendt, who, in the meantime, had scrambled on to the side of the vessel as she rolled over, hauled both men to safety.

The petitioners have no complaint to make of the way Captain Francis handled his vessel immediately after the collision. They admit that the water-tight doors were closed promptly, and that there was no disorder or confusion on board the ship. They concede also that the master's first duty was to save the lives intrusted to his care; and they have no criticism of the manner in which he discharged that duty. They assert, however, that from 4:48 p. m., when the last lifeboat left the vessel, valuable time was lost in making the Fort Victoria ready for towing, and in utilizing assistance at hand for the purpose of beaching the vessel.

But obviously the New York was not available for towing until after the last lifeboat had been picked up at 5:45 p. m.; and it is not seriously urged that the Algonquin either offered or could properly have towed the Fort Victoria to shoal water. The same probably is true also of the Favorita, which did not reach the Fort Victoria until 5:05 p. m., and was not a satisfactory towing vessel. By that time, also, there was every reason to expect that the New York would shortly be ready for towing; and when the last lifeboat had been safely accounted for, at 5:45 p. m., the New York immediately came alongside the Fort Victoria, and the Fort Victoria's line was promptly passed to her. It was only then that the trouble with the anchor chain developed; and surely this unforeseen difficulty could hardly have been anticipated or guarded against.

The Columbine reached the Fort Victoria at 5:55 p. m., having come from Gravesend Bay in response to one of the Fort Victoria's S O S signals. She was owned in Baltimore, and originally built as a lighthouse tender in 1892; later, she was made over into a wrecking steamer, and used primarily to tow vessels to Baltimore "for scrapping purposes." Her indicated horse power was 800, length 145.5, breadth 26.4, depth 14, gross tonnage 456, and net tonnage 307. She had on board, as part of her regular equipment, an acetylene burning torch, and two 200-fathom towing lines, one 9-inch diameter, and the other 10-inch. Captain Cullison of the Columbine testified that when he came alongside the Fort Victoria, he called to the bridge and asked what they wanted him to do; that in reply he was asked if he had on board "a burning gear" to burn the Fort Victoria's chain, to which he answered in the affirmative. He then directed that the burning "rig" be brought on deck and moved aft for transfer to the Fort Victoria; and, when the equipment was "about ready," "someone from the bridge of the ship called over and wanted to know what steamer it was, and I told him it was the Columbine, and he wanted to know who were the owners, and I told him the Union Shipbuilding Company of Baltimore, and they wanted to know who sent us, and I told them we had answered his distress call, and he told me that he didn't need our assistance, didn't care for our assistance."

Captain Cullison estimated that it took about 5 minutes to get the "burning rig" out of the Columbine's hold and onto the deck, and that it would have taken about 15 minutes more to have transferred the equipment to the deck of the Fort Victoria, and a further 5 minutes to adjust the burner and burn the chain; so that even if Captain Cullison's offer had been accepted, the chain could hardly have been burned through before 6:20 p. m., or not much sooner than it was actually cut through with the aid of the hack saw. But however that may be, it was the deliberate judgment of those on board the Fort Victoria that, under the conditions then existing, nothing would be gained by attempting to operate the burning torch; and I cannot say that this decision was wrong. Certainly, the judgment of those on the spot is entitled to greater weight in that respect than the opinion of those who seek to criticize after the event. The Mary T. Tracy (D. C.) 298 F. 528.

It is, however, insisted that the Columbine was superior to the New York in towing ability; but that is not borne out by a comparison of the data relating to the two vessels. The gross tonnage of the New York is 541 against the Columbine's 456; her length is 155 feet against the Columbine's 145.5; her breadth 28.1 against the Columbine's 26.4; and her depth 19.9 against the Columbine's 14. Both vessels are rated at 800 horse power. Moreover, the New York has been utilized frequently as a towing vessel, and, despite her cutaway bow, was shown to have well-recognized towing qualities. Furthermore, those in charge of the New York had a greater familiarity with New York waters, and the spot where the Fort Victoria might properly be beached, than those on board the

Columbine. I cannot believe, therefore, that there was any advantage in changing from the New York to the Columbine at 5:55 p. m., when the Columbine first offered her assistance, especially as at that time the line to the New York was out, and she was ready to go.

It is asserted, though, that the Columbine's two 200-fathom lines would have been helpful in turning the Fort Victoria around and towing her to shoal water; but the fact that the Columbine had these two long hawsers on board was not communicated to the Fort Victoria, and even if it had been, I doubt whether any additional length of hawser beyond the 90-fathom line actually used would have expedited the towing; for in the darkness and fog it was clearly inadvisable to have a long tow line out to the Fort Victoria, and, except for the ground swell, the surface and tide conditions were not disadvantageous for towing on a short hawser.

There was nothing to be gained, either, in using both the New York and the Columbine simultaneously to tow the Fort Victoria, as the saving of time would not have been appreciable, and any added speed in towing would have been extremely dangerous. Indeed, the New York had more power than she could safely use, and proceeded only at slow and half speed during the towing operations.

The radio messages exchanged between the Fort Victoria and her owners in New York have been explored by the petitioners in an attempt to show that the assistance of the Columbine was refused to save the salvage expense; but a careful reading of these messages discloses merely that the owners were zealously trying to bring help to the Fort Victoria, and that the Fort Victoria was waiting expectantly for such help. There is nothing, however, to support the contention that Captain Francis delayed the towing of his vessel, or refrained from taking any action deemed by him wise or prudent for the preservation of the property entrusted to his care, because of these communications with the owners; and the suggestion that Captain Francis' judgment was influenced by an unwillingness to subject the owners to an obligation for salvage services is plainly untenable, as it was not the owners' money he would have saved, but rather that of the petitioners, whose vessel was solely responsible for the damage, whatever it might ultimately prove to be.

Captain Francis maintained throughout his entire testimony that he at no time refused the assistance of the Columbine, and had nothing to do with the decision regarding the burning equipment. He realized the precarious situation of those still on board the Fort Victoria, and asked Captain Cullison to stand by with his vessel to take off the men from the Fort Victoria in case of emergency; and the wisdom of his judgment in making this disposition was amply justified by what subsequently transpired. For had it not been for the quick and meritorious action of the Columbine in rescuing the men from the Fort Victoria as she went down, it is extremely doubtful whether any of them would have been saved.

I do not believe, therefore, that it can fairly be said that there was any negligence, or even any error of judgment, on the part of those in charge of the Fort Victoria in declining to accept the Columbine's offer of her burning equipment, or in failing to make use of her towing assistance, or in the way the Fort Victoria was handled after the collision; but however that may be, there was no showing by the petitioners of any intervening act of negligence of a nature so plainly faulty as to break the causal connection between the collision and the loss sustained. The Walter A. Luckenbach (C. C. A.) 14 F.(2d) 100; certiorari denied, 273 U. S. 741, 47 S. Ct. 335, 71 L. Ed. 868; Allen & Robinson v. Inter-Island (C. C. A.) 34 F.(2d) 83; The Glendola (C. C. A.) 47 F.(2d) 206; L. R. Connett No. 17 (C. C. A.) 54 F.(2d) 626; The City of Macon (C. C. A.) 121 F. 686. The burden was on the petitioners to make this showing, The Walter A. Luckenbach, supra; The Bartle Daly (C. C. A.) 45 F.(2d) 605; and this they have failed to do.

There may be a decree adjudging that the petitioners are liable for the damages sustained by the cargo, and passenger and crew claimants, as a result of the sinking of the Fort Victoria.