### THE ALGONQUIN.

### CHEROKEE–SEMINOLE S. S. CORPORATION et al. v. KINGAN PROVISION CO. et al.
### No. 287.

Circuit Court of Appeals, Second Circuit.
April 2, 1934.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and A. Howard Neely, both of New York City, of counsel), for petitioners-appellants.

Bigham, Englar, Jones & Houston, Bailey & Muller, Single, Atkins & Tyler and Carter, Ledyard & Milburn, all of New York City (Leonard J. Matteson, W. Henry Woolley, Alonzo L. Tyler, and Rush Taggart, all of New York City, of counsel), for claimants-appellants.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is an appeal from an interlocutory decree in admiralty holding Cherokee-Seminole Steamship Corporation and Clyde-Mallory Lines liable for the loss sustained by claimants of cargo and personal effects due to the sinking and total loss of the steamship Victoria on December 18, 1929, four hours after she had been in collision with the steamship Algonquin outside Ambrose Channel. After the accident, appellants, as owner and charterer of the Algonquin, respectively, filed a petition for limitation of liability, and 585 claimants filed claims covering the total loss of the Victoria, her cargo and the personal effects of passengers and crew. At the time of the collision (3:50 p. m.) the Victoria had stopped to discharge her pilot. The pilot boat had arrived and taken a position off the Victoria. The pilot boat's yawl had been put over and was approaching the side of the Victoria to take off her pilot. The vessel had stopped dead in the water and was blowing her fog signals at frequent intervals when the Algonquin suddenly appeared through the fog and crashed into the port side of the Victoria, about amidships, at nearly right angles. The Algonquin penetrated into the hull, a distance of from eight to ten feet, tearing a big circular hole in the side of the ship which admitted water and promptly put the engines out of commission. The boiler room filled quickly, but the water-tight doors between the boiler room and engine room were closed promptly. The chief engineer reported to the captain that the boiler room was flooded but that the water-tight doors had been closed. The pilot, who remained on the bridge, advised the master to drop the ship's anchor to prevent her going out to sea or drifting on top of any other vessels which might be anchored in the vicinity, and this was done shortly after the collision. The vessel was completely disabled and was filling with water, and, as the master thought that she would "possibly sink," he ordered the crew to their boat stations and sent the stewards to the staterooms to get everybody up to the boat deck. The passengers were placed in lifeboats to be transferred and picked up by the pilot boats. The pilot boat New York stood by, and subsequently the pilot boat Sandy Hook reached the scene. These two vessels picked up the lifeboats of the Victoria, and finally the passengers and most of the crew were put on board the pilot boats. It was thick fog at the time of the collision, and, at that time of the year, dark in half to three-quarters of an hour thereafter. From the time of the collision, the Victoria became not only without power, but without lights. The collision was due to the negligence of the Algonquin, and it is not questioned that the owner and charterer are entitled to limitation of liability in respect to damages which may be established in the limitation proceeding arising out of the collision by the Algonquin. Attempts were made by the master and crew to beach the Victoria in shallow water, but they were unavailing, and finally, after being towed from the place of the collision in order to place her in shallow water, she filled and sank at about 7:45 p. m., in about fifty feet of water. The petitioners have taken this appeal from a decree awarding damages to the claimants of the cargo and personal effects on board the Victoria on the ground that sufficient time and assistance were available to beach her and save her cargo and that her sinking and the damage to the cargo were due to the intervening negligence of those in charge of the Victoria in failing to have her towed to a place of safety, and that accordingly the collision was not the proximate cause of the loss. Before discussing the question whether those in charge of the Victoria were negligent in failing to take proper steps in attempting to tow her to a place of safety, it must be borne in mind that the petitioners will not be exonerated merely by showing negligence on the part of the Victoria. To be relieved of liability they must show an intervening act of negligence so extravagant and unusual, and in such disregard of ev-

ery rule of prudence, as to be beyond the horizon of ordinary foresight. The L. R. Connett No. 17 (C. C. A.) 54 F.(2d) 626; The Glendola (C. C. A.) 47 F.(2d) 206; Hansen v. E. I. Du Pont, etc., Co. (C. C. A.) 33 F.(2d) 94; The Walter A. Luckenbach (C. C. A.) 14 F.(2d) 100; The Mellona, 3 W. Rob. Adm. 7. Otherwise, even though the master of the Victoria may have been to some extent negligent, the innocent owners of cargo are entitled to recover against the Algonquin, whether as a sole or as one of two tort-feasors. Upon the record before us, we are convinced that the fault of the master of the Victoria, if any, was not beyond the range of reasonable expectation or so highly unlikely as to break the so-called "causal chain." If, with better judgment, the master had accepted assistance sooner, or had adopted wiser means to get his anchor lifted, or had otherwise expedited the towing of his vessel into shallow water, yet it was quite within reasonable expectation that in an emergency there might be delay owing to the exercise of judgment other than the best, which would prevent him from beaching his rapidly leaking vessel until it was too late to save her cargo. As we said in The Glendola, 47 F.(2d) 206, at page 208: "It is the probability of the occurrence of the wrong which counts, not the fact that it is a wrong; its unlawfulness is material only in so far as wrongs are less likely to happen than other events." See, also, The George H. Jones (C. C. A.) 27 F.(2d) 665, at page 668; 25 Harv. Law Rev. p. 113.

It is contended by the appellants that the master of the Victoria did not get prompt and adequate assistance as he ought, that he was negligent in clearing the anchor chain so that towing operations could be begun and in general was too slow in starting the towing operations, and at fault in employing too short and fragile towing lines. It is to be remembered that it took about an hour to get the passengers off the vessel and another hour to see that the boats in which they had been placed were picked up and the passengers and the crew, except those of the crew who remained on the Victoria, were put on boats to take them ashore. We are not satisfied that the Columbine, which appellants insist should have been used to tow the Victoria, was better for that purpose than the New York. It is said she had hawsers more adequate for the purpose than those used, but this fact was never brought to the attention of the master of the Victoria, and it is by no means certain that long hawsers such as are used for towing on the high seas would have been as good for the waters in which the towing had to be done as the lines actually used. As Judge Coxe held, it was inadvisable to have a long towline in the darkness and fog. The Victoria had no lights, and the towing vessel would not have been able to see her tow in the fog and darkness or to steer its course at all if it had been far away from her. A long towing line would certainly have added to the difficulties and uncertainty of the navigation.

Faults are alleged in respect to the steps taken to free the anchor chain so that the towing might begin. It is said that the master should have used the acetylene torch of the Columbine instead of sawing off a link with a handsaw. But it seems uncertain what, if any, time would have been saved by doing this, for the sawing had begun before the arrival of the Columbine, and it might reasonably have been thought to take less time to complete it than to get the torch from the Columbine and use it.

The master asked the Columbine to stand by, and he chose another vessel, equally good, for towing. The Columbine did stand by and as a matter of fact furnished the means for enabling the crew to escape from the vessel as she was sinking and likewise saved the life of the master of the Victoria, who was the last to leave his ship. It is true that, after the Victoria had been towed about a mile by the New York, the cable broke under what was doubtless an uneven strain probably caused in part by the absence of any effective steering apparatus on the part of the Victoria. The breaking of a towing line under such circumstances is not unusual and often happens in salvage cases which have come to our attention. The District Judge, in a careful opinion, (6 F. Supp. 644) held that the master of the Victoria did everything that could be expected in the emergency, and we are not disposed to differ with his findings.

A more detailed discussion of the facts is unnecessary and a more careful scrutiny is useless for the reason that the negligence of the Algonquin beyond any question caused the damage and the sinking of the Victoria. Whatever errors of judgment the master may have committed, and we are not convinced that there were any, the happenings were those which a vessel wrongfully colliding with another must expect in the situation which she had brought about.

The decree is affirmed.