ALLEN & ROBINSON, Limited, et al. v. IN-
TER-ISLAND STEAM NAV. CO.,
Limited.*

Circuit Court of Appeals, Ninth Circuit.
August 12, 1929.

No. 5615.

Thompson, Cathcart, Beebe & Winn,
Smith, Wild & Hoppe, I. M. Stainback, and
Henry Holmes, all of Honolulu, Hawaii, and
Louis T. Hengstler and Frederick W. Dorr,
both of San Francisco, Cal., for appellants.

Smith, Warren, Stanley & Vitousek, L. J.
Warren, W. L. Stanley, and R. A. Vitousek,
all of Honolulu, Hawaii, for appellee.

Before RUDKIN, DIETRICH, and WIL-
BUR, Circuit Judges.

DIETRICH, Circuit Judge. Between 9
and 9:30 p. m., on April 20, 1923, the steam-
ship Mauna Kea, east bound, rammed the

*Rehearing denied October 14, 1929.

wooden lumber schooner Mary E. Foster,
west bound, off Diamond Head, Oahu Island,
a few miles eastward of Honolulu Harbor.
The Foster was fully laden with lumber both
below and above deck; the deck load being
approximately 14 feet high. In the collision
the Mauna Kea cut through her starboard
side just abaft her main rigging, the cut hav-
ing a width of about 18 inches and extend-
ing through her bulwarks and for a distance
of approximately 8 feet downward from the
top of her waterway or covering board.
Rushing in, the water gave her a heavy list
to port. She filled in about an hour, and
gradually righted herself, but it is doubtful
whether she ever reached an even keel. With
the hope of being able to tow her to Hono-
lulu, the Mauna Kea stood by for over an
hour, but, failing to reach her with a tow line,
at 10:36 o'clock she proceeded to the harbor
with the understanding that she would send
out a tug. The Foster settled until the water
covered part of her main deck and flooded
her cabin, lazarette, and chain lockers. Her
lights were extinguished, her charts were
washed away, and both the gasoline and don-
key engines were put out of service. A little
after midnight, and shortly before the tug
arrived, she stranded on a coral reef a short
distance offshore. The appellants, her own-
ers, brought this suit to recover damages re-
sulting directly from the collision and ulti-
mately from the stranding as well. Answer-
ing, the owners of the Mauna Kea admitted
liability for the collision, but affirmatively al-
leged that the stranding was occasioned whol-
ly by the neglect and want of proper seaman-
ship on the part of the Foster's master and
crew. This view was adopted by the court
below, and accordingly there was a decree in
libelants' favor for only such damages as re-
sulted immediately from the collision. A
large part of the testimony was in the form
of depositions.

From an extended examination of the
voluminous record, we are convinced that the
controlling and, indeed, the only substantial
question is whether the appellants are de-
barred from recovering the stranding loss be-
cause of the failure of the Foster's master
and crew to make use of her anchors. That
the anchors were not put into service is ad-
mitted, and, briefly as may be, we refer to the
circumstances.

At the time of the collision the Foster was
about seven miles southeast of Diamond
Head, where there is a lighthouse, steering
a westerly course, which would have taken
her past the Head, about a mile off. The

moon was then shining, and, from the general testimony given by witnesses for both sides, it might fairly be concluded that the moonlight continued up to the time of the stranding. But by the tables of the "Nautical Almanac" it is conclusively shown that the moon set at 10:22 p. m., or about the time the Mauna Kea left the Foster for the harbor. The only way the apparently conflicting testimony upon the subject can be reconciled is by assuming that the witnesses who testified that it was a moonlight night bore recollection of the period prior to 10:22 p. m., and those who testified that the night was "very dark" had in mind the later period. The light from the lighthouse, of course, was visible, but, after the moon set, objects upon the land and the shore line, though not wholly invisible, were measurably vague and indistinct. The sea was not rough, but there was some swell. There was an offshore breeze, light, intermittent, and at times "puffy." Having in mind the heavy on-deck load and the possibility of capsizing as the Foster filled and listed heavily to port, her master ordered the lowering of her main and mizzen sails, and with reduced sail forward he hoped to make headway slowly toward the harbor and keep offshore. Such was the course pursued during the hour or more the Mauna Kea was maneuvering about her in an attempt to take her in tow, and at no time did the latter suggest that she should seek anchorage. The same tactics were continued after the departure of the Mauna Kea. Heeled over to some extent and waterlogged, the Foster steered very sluggishly. With the necessarily reduced sail, she made headway slowly, at best. When the wind died down, she did not respond to the wheel, and at such times, owing to the currents and other forces, her drift was shoreward; and with a rise of the wind she would come around two or three points offshore. The object of the master, of course, was by the use of as much sail pressure as was safe to employ to keep her moving slowly toward the harbor and to overcome the tendency of the shoreward drift. The problem confronting him was a delicate one, involving measurably the uncertainties of a fluctuating breeze and forces making for the shoreward drift. He could reasonably expect that the Mauna Kea would send out a tug without great delay. He also kept burning a flare-torch distress signal which sooner or later would be likely to bring assistance from some source. He was reasonably familiar with the locality, but, owing to the darkness, his precise position at any moment

and his proximity to shore and reefs were measurably uncertain.

As we read the testimony, it was the opinion of even appellee's experts, having the benefit of the wisdom which comes after the event, that up to a certain point at least the master exercised good judgment in thus attempting to move the disabled vessel under sail; that is, that anchorage was not to be sought until there was good reason to believe that she could not in that manner be kept offshore. They were, however, of the opinion that at some point before the Foster struck the anchors should have been used. And, considering the fact that the master knew that as a net result of her various movements she had a shoreward drift, the conclusion would seem to be legitimate, if it be assumed that he had knowledge of the depth of the water and his facilities for anchoring were normal. But such knowledge he did not have, and, as already noted, his charts were lost. Approximately an hour before the stranding, under his direction the second mate began to take soundings. The Foster had been equipped with two leads, hand and deep-sea, both of which were stowed in the lazarette, which was flooded. It was found that the tub in which the hand lead was carried had been upset, and, in short, the mate was unable to find this lead at all, and, on seeking to extricate the deep-sea lead, he found the line tangled so that it had to be cut at a length of between 30 and 40 fathoms. Because of its weight—about twenty pounds—this lead was handled with difficulty, but with it the mate attempted a sounding about every 10 or 15 minutes, at a depth of 20 fathoms. He failed to reach bottom until a few seconds before the vessel struck, at which time he called out that the lead had hooked on the bottom and was lost. Then, of course, it was too late to drop anchor with any effect. Asked why he did not let go her anchors before she struck, the master testified: "At the time we got the last sounding she (the schooner) was paying off to seaward and it was not very long before she hit. That is why. We had twenty fathoms and no bottom and she was paying off to seaward."

Apparently, there is danger in dropping or letting go an anchor without knowing the depth of the water, and such a practice would not be good seamanship, but, in the most favorable view to appellee, the question is open to a difference of opinion, and in the exercise of his judgment the master of the Foster could not be charged with negligence or incompetency. Captain Peasley, a mari-

ner of long experience in sailing lumber carrying vessels, testified: "I would not consider it good seamanship to let go any anchor until I knew how far it was before it was going to strike bottom, how far to bottom." And to the question: "From your knowledge of the situation out there at Diamond Head, Captain, would you not have known that you could have got bottom before getting within a quarter of a mile of the shore?" he answered: "No, I would not have any way of knowing it until I put the lead over. * * * Q. You mean your general knowledge of the shoaling waters around there would not have told you that you were getting within an anchorage depth? A. My dear sir, there is nothing. In the daytime possibly, yes, but not in the night, I would say."

By some of appellee's experts, however, the view was advanced that while under the circumstances it may not have been advisable to let go or drop the anchors, gear might have been rigged up to lower the anchors to a desired depth, say 40 or 45 fathoms, and let them hang there with a view to engaging with the bottom if and when the vessel came into shallow water. The master conceded that under some circumstances such a course is practicable, but pertinently suggested that the preparation therefor would have taken time. And the mate testified: "You must remember when a ship is in such condition as that we have no time to reeve rope; we have to make soundings and take care of the ship." And, as was suggested by Captain Peasley, consideration must be given to the existing exigencies, the excitement of the men, and the difficulties of working and of getting the crew to do exactly what they are told and making no false moves. It is to be borne in mind, too, that the Foster was at that time without power facilities, such as the donkey and gasoline engines, and the chain locker was filled with water, so that with floating débris there was no assurance that the chains would run out without entanglement. Furthermore, the master testified that, waterlogged and listing as she was, the vessel would be in danger of capsizing in case she was suddenly fetched up with a full anchorage out. That this peril is not fanciful and a mere afterthought on his part is shown by the testimony of one of appellee's principal experts who on direct examination had put forward the contention, not that the master should have dropped his anchors, but that he should have payed out or lowered them in the manner above described. On cross-examination he testified:

"Q. And you would not let go your anchors for fear you might be in deep water and when she came up on the bitter end you might lose your anchor, is that the reason you would not let them go? A. Yes.

"Q. You would pay them out from 30 to 45 fathoms? A. Under these conditions I would certainly give her 45 fathoms all right, the chances are I would give her more.

"Q. A great deal would depend upon how much cable or chain you had as to how much you would pay out? A. Naturally.

"Q. Under those circumstances, Captain, which anchor or cable would you have first payed out, the starboard or port anchor? A. The offshore.

"Q. The offshore anchor. In this instance it would be the port anchor, would it not, in a vessel headed toward Honolulu? A. Yes.

"Q. When that anchor fetched up would there be any danger of capsizing, particularly in view of the fact that the schooner took a decided port list immediately after the impact? A. If she fetched up suddenly there might be a possibility.

"Q. And is that not one of the things that a skipper or master of the vessel would consider under those circumstances? A. It is.

"Q. You would consider it if you were placed in that same predicament, would you not? A. I would consider it.

"Q. And from your knowledge of the bottom out there and from your study of the charts, would you say that there was or was not danger of a vessel under those circumstances, with that anchor out, fetching up suddenly? A. There would be a chance.

True, upon redirect he explained:

"I am particularly anxious to state that in my opinion that when an anchor is lowered down under these conditions there should be enough chain left in the chain locker so that when she fetched up it could be eased away and the strain eased gently, until she fetched up gently, without causing danger of carrying away the chain or introducing the danger of capsizing."

■ That is to assume the existence in working order of appropriate means for lowering and the full control of the anchor chains. But the Foster is not shown to have had available at the time such equipment, and, as already noted, the conditions were such as to suggest the possibility, if not the probability, of chain entanglement. Had the master anticipated the delay which took place in getting a tow, rigged up a gear for lowering the an-

chors, followed the course suggested, and the vessel had capsized or lost her anchors due to some unexpected occurrence, it would have been easy for experts to testify that it was bad seamanship, and that he should have continued to rely upon his sails and should have withheld his anchors until he sounded bottom. In The Walter A. Luckenbach (C. C. A.) 14 F.(2d) 100, 102, we said:

"The question then arises: Is the master to be condemned? The problem confronting him was a problem of the sea, to be solved in the first instance by seafaring men. We should not view the situation in retrospect or from the shore, but from the viewpoint of the master on the bridge of the crippled ship, charged with full responsibility for her safety and for the safety of her cargo and crew; and, when viewed in that light, we must not only be able to say that the course pursued was wrong, but we must be further able to say that it was so illy considered and so plainly wrong that a competent navigator would have rejected it, if placed in the like position. The master of the Steward may have erred in the measures adopted to extricate his vessel from the perils in which she was placed by the collision, but, if he did, it was in our opinion an error of judgment only, such an any competent navigator might have committed under the like circumstances."

■ To the rule or principle thus declared we adhere, and under it we do not think the appellants are debarred from full recovery by anything the master did or left undone. If in the light we now have it may be thought he erred in any respect, it was at most but an error of judgment, made at a critical time, in the solution of a delicate problem having uncertain factors, and was "such as any competent navigator might have committed under like circumstances." We do not think that the owners of the Foster ought to be compelled to suffer a loss which would not have occurred but for the admitted initial fault of the appellee. Undoubtedly, the stranding was a natural result of the collision, and the most that can be said is that possibly it might have been prevented by use of the anchors. But with equal reason it could be said that the stranding might have been prevented had the Mauna Kea immediately hastened to the harbor for assistance, or stood by longer and used greater skill and persistency in taking the Foster in tow, or taken more active steps in procuring a tug. But because of these various possibilities it cannot be said that the stranding was not the proximate result of the collision, or that the master of the Mauna

Kea is chargeable with negligence or incompetency. It is to be assumed that he was a competent mariner and deeply concerned in preventing loss. His attempt to make a tow was an error of judgment, resulting in the waste of more than an hour of precious time, but for which a tug would probably have reached the Foster before she stranded. For like reasons, the Foster's master is not to be charged with negligence or incompetency merely because he adopted an unsuccessful course.

Reversed and remanded, with directions to award to appellants full damages resulting both from the collision and the stranding; costs to appellants.