### THE BARTLE DALY.
### THE DALY BOYS.
### AUTOMOBILE INS. CO. OF HARTFORD, CONN., v. BURNS BROS. et al.
### DALY v. TRACY TOWING LINE, Inc.
#### Nos. 32, 33.

Circuit Court of Appeals, Second Circuit.
Dec. 1, 1930.

Macklin, Brown, Lenahan & Speer, of New York City (Horace L. Cheyney, of New York City, of counsel), for appellant Tracy Towing Line, Inc.

William F. Purdy, of New York City (William F. Purdy and John E. Purdy, both of New York City, of counsel), for appellees Automobile Ins. Co. of Hartford, Conn.

Alexander, Ash & Jones, of New York City (Edward Ash and Lawson R. Jones, both of New York City, of counsel), for appellee Burns Bros.

Single & Single, of New York City (Thomas H. Middleton, of New York City, of counsel), for appellee Bartle Daly.

William J. Mahar, of New York City, for appellee Red Star Towing & Transportation Co.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The foregoing causes were tried together. The first cause involved injuries to the coal barge Duffy, sought to be recovered by its insurance company which became subrogated to its rights, and the second involved injuries to the coal barge Bartle Daly.

By order of Burns Bros., a company which operated a coal dock at the foot of 136th street, Manhattan, on the East River, the Red Star Towing & Transportation Company towed a loaded coal barge to the Burns dock, where it was afterwards tied up outside of the Burns' partly loaded Barge No. 9, which was moored alongside of the Burns' bulkhead. Another barge, Junior, was made fast to the Duffy. About eight hours later, at about 8 p. m., on March 30, 1926, Red Star Towing & Transportation Company

landed the barge Bartle Daly outside the Junior, to which it was made fast, and about 11 p. m. Tracy Towing Line, Inc., added the barge Daly Boys to the tier, where it was placed outside the Bartle Daly. These two additional barges were fastened to the barges next them without running any lines to the dock. The bargee of the Duffy testified that he did not strengthen her mooring by putting out lines to mooring piles along the bulkhead as well as to No. 9 for the reason that No. 9, because of the little cargo on her, rode about 5 feet higher than the Duffy. He said that No. 9 had a cutaway bow which would have severed any lines run to mooring posts along the wharf. However, there were three mooring posts, and we can see no reason why lines could not have been run to the middle post, which was about opposite the middle cleats either from the Duffy, the Junior, the Bartle Daly, or Daly Boys, for the purpose of strengthening the support of the whole flotilla. When the Bartle Daly and the Daly Boys were added to the flotilla, no one, either from the tugs that brought them to the dock, or from the barges themselves, inspected the lines of No. 9, Duffy, or Junior, and the bargees of these three coal boats were asleep in their cabins at the time. At about 2 p. m., when the tide changed to ebb, the lines of No. 9, which held the whole flotilla, because none of the other barges had run lines to mooring posts, parted, and the five barges swung out in the tide and floated down the river until they stranded on Sunken Meadow about two-thirds of a mile in the river below, and the libelants' barges Duffy, Bartle Daly, and Daly Boys sustained injuries. When the barges broke adrift, the bargee of the Duffy got a line out to a barge lying on the north side of the dock, but he could not hold it, and the line pulled out of his hands. All the barges in the tier, except No. 9, were fully loaded with coal, one of them carrying 1,006 tons, and No. 9 itself was not entirely empty. Consequently the flotilla carried a great weight of cargo. It affirmatively appeared that No. 9 and Duffy had no anchors, and there was no proof that any of the other barges used or even had anchors.

The only relation of Burns Bros. to the other parties was that they owned or leased the wharf and were consignees of the cargoes of coal. There was evidence that Daly Boys might have been placed next the pier outside of some other barges rather than outside Bartle Daly.

The first libel was brought on behalf of the Duffy against Burns Bros., and alleged that they were at fault in allowing Bartle Daly and Daly Boys to be added to the tier of the first three barges without seeing that the fastenings of the inside barges were proper, when they should have known that it was dangerous to do this. Burns Bros. impleaded the barges Bartle Daly and Daly Boys and Red Star Towing & Transportation Company, charging as to the barges that they were responsible for not seeing that the inside fastenings were sufficient to hold the flotilla and for being moored in a place dangerous to Duffy, and charging as to the Red Star Towing & Transportation Company that it was responsible for placing an improper strain on the inside barges. Bartle Daly, claimant of barges Bartle Daly and Daly Boys, thereupon impleaded Tracy Towing Line, Inc., charging it with fault in improperly mooring Daly Boys to the inside barges, and seeking to establish that Tracy Towing Line, Inc., and not Bartle Daly and Daly Boys, was responsible for any damage to the Duffy.

The second libel was brought by Bartle Daly against Tracy Towing Line, Inc., to recover damages against the latter in failing to examine the lines of the inside barges and for mooring Daly Boys improperly.

The trial judge found that there were no unusual conditions of weather or tide; that the parting of the lines of No. 9 was due to the excessive weight put upon them; that there was no reason to believe that the moorings of No. 9 would not have held the flotilla except for the addition of Daly Boys, the last barge; and that it could not be said the failure to use anchors contributed to the damage. He held that there was sufficient space in the slip for the Daly barges to have been tied up elsewhere than at the end of the string, and that Burns Bros. were, therefore, not in fault for failing to furnish a safe berth; that Tracy Towing Line, Inc., was alone responsible for adding the last barge to the flotilla without examining the inshore lines.

It seems clear that Burns Bros., who had no relation to the libelants except that of wharfingers, were not liable. They invited the barges to a wharf where, the trial court has held, there was room to moor elsewhere than in the place selected. Likewise there was opportunity for the Bartle Daly and Daly Boys and all of the other barges to strengthen their moorings by running further lines to one of the spiles next the bulkhead. Burns Bros. had no reason to believe that the tugs would add barges to the string with-

out making sure that the inside fastenings were strong enough to support the added weight.

 The point most seriously argued by the appellant, Tracy Towing Line, Inc., is that the proximate cause of the damage to the barges was their failure to have and use anchors. There can be no doubt that the neglect of any barge to carry an anchor was a statutory fault, and that each barge, or its owner, was subject to the same liability that would have been imposed had an anchor been carried and not used. The Panther (C. C. A.) 5 F.(2d) 64; The Red Eagle (C. C. A.) 3 F.(2d) 541. The failure to drop an anchor would, however, only be a fault if the use of an anchor would have done any good, because only in that event would the failure to act have contributed to the injury. But there can be no doubt that the appellant's tug improperly placed Daly Boys at the end of the string of barges without examining the shore lines and without seeing that the fasts were sufficient to bear her added weight. These acts of negligence resulted in the breaking away of the flotilla and injury to the barges for which appellant would ordinarily be liable. Cleary Bros. v. Port Reading R. Co. (C. C. A.) 29 F.(2d) 495; Pennsylvania R. Co. v. James McWilliams Towing Line (C. C. A.) 277 F. 798; McWilliams Bros., Inc., v. Davis (C. C. A.) 285 F. 312. It can escape only if it can establish as an affirmative defense that the use of anchors would have prevented the casualty. If it can do this, it is excused, but it has the burden of proof. The Baltimore, 8 Wall. at page 387, 19 L. Ed. 463; Central Vermont Ry. Co. v. White, 238 U. S. 507, 35 S. Ct. 865, 59 L. Ed. 1433, Ann. Cas. 1916B, 252; Allen & Robinson v. Inter-Island Nav. Co. (C. C. A.) 34 F.(2d) 83; The Walter A. Luckenbach (C. C. A.) 14 F.(2d) 100; The Gladiator (C. C. A.) 79 F. 445; The Pensher, Swab 212.

We think it was fairly established that if the barges, for the damage to which the libels have been filed, had used anchors, the stranding would not have been prevented. McConnell, the tugboat captain, testified that anchors would not have held. He was apparently a disinterested witness of large experience, and based his opinion both upon the strength of the tide and upon the fact that the bottom of the channel was rocky from 136th street down. Reed, the bargee of the Duffy, likewise said that an anchor would not have been of any assistance. White, the bargee of No. 9, was of the same opinion, though he qualified his first state-

ment by saying, "If it caught in the mud right, it might hold." The conclusions of McConnell are criticised on the ground that he based his opinion on too high an estimate of the force of the tide, which he thought would run at about 4 knots an hour. Lilienfeld, who at one time was connected with the United States engineers, and had made tests of current conditions in the neighborhood of Lawrence Point in the East River some five years before the accident, estimated the force of the tide at only 1.6 knots per hour. But if, as the trial court found, it took only 15 minutes for the barges to get down from 136th street to Sunken Meadow, the tide must have been running at a much higher rate of speed than that.

Some of the testimony was to the effect that 20 to 25 minutes elapsed between the breaking loose of the flotilla and the stranding, but, if we consider the slowness of movement of the barges before they would get out into the channel and receive the full strength of the tide, it seems probable that the tide ran at a rate considerably in excess of Lilienfeld's estimate. Indeed, if the finding of the trial court that only 15 minutes elapsed before the stranding was correct, there would seem to have been a tide nearer 3 knots than 1.6.

Anchor chains cannot be got out and anchors dropped in a minute. If anchors had been carried, before they could have been used, the flotilla, with the momentum caused by its cargo of several thousand tons of coal, would have been sweeping down stream under the full force of the tide.

The conclusion of the trial judge that the use of an anchor by the Duffy alone would not have stopped the tow, nor would the use of an anchor by the two Daly barges have had that effect, seems to have been supported and indeed required by the evidence.

Judge Campbell, in dealing with this very collision in The Bartle Daly, 45 F.(2d) 603, 1929 A. M. C. 1191, said:

"The evidence shows that the Bartle Daly did not have an anchor, and this would be a fault if such an anchor could have served in any way to have prevented the accident, but it could not, first because the rocky bottom would have rendered its use of no avail, and also because if the Bartle Daly and Daly Boys had been provided with anchors, I cannot assume that they would have been sufficient to hold up the whole flotilla, which held together, and the failure of the other boats to carry anchors could not be charged to the libellant."

We are satisfied that the Tracy tug, which was clearly a wrongdoer in tying up Daly Boys without ascertaining whether her weight could safely be added to the string of barges, ought not to escape liability simply by showing a possibility that the damage might have been averted by the use of anchors. The evidence regarding the probability of preventing the stranding by the use of anchors was against the tug, and the latter had the burden of proof.

Decree affirmed.