Petition of LIVERPOOL, BRAZIL & RIVER PLATE STEAM NAV. CO.

THE SWINBURNE.

District Court, S. D. New York.
Feb. 20, 1934.

Burlingham, Veeder, Fearey, Clark & Hupper, Chauncey I. Clark, and Stanley R. Wright, all of New York City, for petitioner.

Martin Conboy, U. S. Atty., and Charles E. Wythe, Sp. Asst., both of New York City, for claimant.

GODDARD, District Judge.

This proceeding was brought under the provisions of sections 4283 to 4285 of the

Revised Statutes (46 USCA §§ 183–185), by the Liverpool, Brazil & River Plate Steam Navigation Company, Limited, as owner of the steamship Swinburne, in which it prays for exoneration from or limitation of liability, arising out of the collision which occurred around 4 a. m. on May 7, 1928, between the United States Army dredge Navesink and the steamship Swinburne in the vicinity of quarantine anchorage, New York Harbor. The Navesink sank shortly after the contact and nineteen of her crew were drowned and other members of her crew sustained injuries. The damage to the Swinburne was comparatively light.

The Swinburne was a steamship 4,659 tons gross; 2,883 tons net registered; 385.5 feet long; 52.2 feet beam; 27.2 feet depth of hold, with draft of 15.5 feet aft and 11 feet forward. The dredge Navesink was a vessel of 3,911 tons' displacement; 290 feet long; with a breadth of 47 feet and depth of 28 feet.

On the early morning of May 7, 1928, the steamship Swinburne arrived at quarantine, New York Harbor, bound from Para, Brazil, to Pier 8, Brooklyn, with a cargo consisting chiefly of nuts and rubber. She proceeded to anchor off quarantine, there to await inspection, riding to her port anchor with sixty fathoms of chain. Anchor lights were set and a watch was maintained consisting of the second officer on the bridge, and three able seamen, one of whom was stationed on the forecastle head, another aft, and a relief around the deck. There was a strong ebb tide of 3½ to 4 knots an hour; the wind was N. N. E. force of about twenty miles an hour. The night was dark; weather overcast, but visibility good.

Off the quarantine station there is a "temporary quarantine anchorage" intended for vessels awaiting quarantine inspection. The established easterly limit of this "temporary anchorage" is defined by an imaginary line drawn through Craven Shoal Buoy and Robbins Reef Lighthouse and which runs in the general direction of north and south. On this Sunday in May, 1928, when many vessels were arriving at New York Harbor, the temporary anchorage ground was crowded with vessels waiting quarantine inspection on Monday morning.

At this time the government was carrying on dredging operations between 700 and 750 feet eastward of the "temporary anchorage grounds." The dredging was along a line of three buoys, A, B, and C; A being the southerly end of the line, B in the middle, and C at the northerly end. The line of these operations was some 2,500 or more feet long and about parallel with the eastern boundary of the "temporary anchorage grounds."

Shortly after midnight of May 7, the Navesink left Pier 3, Army Base, Brooklyn, and proceeded out to the dredging grounds marked by the three buoys. When she arrived at the dredging grounds those in charge of her saw the Swinburne at anchor to the westward of where the dredging was being done. The Navesink began dredging near Buoy A at the southerly end, working up to the northward to Buoy C, and rounding that buoy back again to Buoy A, and so on. The Navesink had made four northerly trips, rounded the northerly Buoy C, and proceeded on her fourth down trip, with an ebb tide running at 3½ to 4 knots an hour and with a twenty mile N.N.E. wind, and having nearly a full load of dredging material. When the dredge was in the vicinity of Buoy C, Sims, her mate who was in charge of her, testified that he saw the lights of the steamer Caronia a mile and a half or two miles away coming up through the Narrows bound for the quarantine anchorage, and he stopped her engines with the "drags" of the dredge resting on the bottom; that shortly afterwards he saw that the Caronia was swinging to the westward and he ordered the "drags" up; that the port "drag" came up, but that the starboard "drag" stuck temporarily and this, with the set of the tide, caused the bow of the Navesink to pivot rapidly several points to the starboard; that as he was then on the working bridge he hastened forward to the pilot house 60 feet away where the engine telegraphs were located and where he had an unobstructed view forward; that when he arrived at the pilot house the sheer had increased and the dredge had lost her headway and her bow was being carried rapidly to the starboard with the tide, and he ordered the port engine and soon after that the starboard engine full speed astern, but the tide continued to carry her sidewise down toward the Swinburne; when three to four hundred feet away from the Swinburne he began to blow danger whistles. (Before the Army Board of Inquiry held shortly after the collision, he testified that the Navesink was 200 feet away from the Swinburne when he blew the whistles.) A minute or less after the whistles had been blown, the Navesink's starboard side brought up against the Swinburne's stem at an angle of about 90 degrees, cutting open the side of the Navesink at a point variously estimated as being 45 feet to one-third of her length from her stem. (Her length was 290

feet.) The dredge then swung clear of the Swinburne's bow and fell away down the port side and sank quickly off the port quarter of the Swinburne.

The only faults charged against the Swinburne which need be discussed are: (1) That she was anchored outside the temporary anchorage grounds and obstructed the navigation of the Navesink; (2) that the Swinburne failed to pay out her anchor chain when the danger of collision was or should have been apparent. While the testimony of the mate of the Navesink placed the Swinburne's anchored position outside and to the eastward of the temporary anchorage limits, the testimony that the Swinburne was anchored within the anchorage grounds is overwhelming and convincing. The location of the wreck is fixed beyond dispute at a point 700 feet inside the eastern boundary of the anchorage grounds, and the testimony as to the distance between the point where the collision occurred and the point where the Navesink sank is variously stated as 200 to 500 feet; the mate of the Navesink himself estimating it at 200 feet. Anchorage bearings were taken by the Swinburne and when laid down on the chart it put her within the anchorage grounds. Only two bearings instead of the usual three were recorded, and so it is quite true that these might not accurately indicate her position, but these at least are corroborative when taken together with the testimony of her master who was familiar with the anchorage limits that he took certain bearings to satisfy himself and that she was to the westward of the boundary line. The testimony that she was outside is scant, and I find that the Swinburne was anchored within the limits of the temporary anchorage grounds, some 250 feet inside the easterly line, and with the set of the tide and wind at the time of the collision she was trailing in a southwesterly direction.

With respect to the other fault charged—that the Swinburne failed to pay out anchor chain when the danger of collision was or should have been apparent—from the facts as I find them, it appears that while the watch officer of the Swinburne was on the bridge he observed the Navesink about 500 feet away and that she was not proceeding as she had on her previous trips, but was apparently out of control and being carried rapidly down on the Swinburne, so he ran forward to the forecastle head to see what, if anything, could be done. This was about a minute before the collision. On his way to the forecastle head he heard danger whistles from the Navesink, and as he reached the top of the ladder at the forecastle head, the collision occurred. If the Navesink was being carried by the tide at 3½ to 4 knots she would have been moving at upwards of 350 feet a minute. The watch officer's testimony as to his actions at this time is as follows:

"Q. What was your purpose in going forward? A. Well, to see her coming down like this there was a big weight and danger of her parting our cable. There were other ships at anchor astern, so I thought to drop the starboard anchor. * * *

"Q. Your intention was to see whether she went on your chain or not? A. My intention was to do what I could. I knew I could do nothing on the bridge. * * *

"Q. You said this sailor, the A. B. by the name of Rezende, was on the forecastle head? A. Yes." * * *

"Q. Could he not have let go the anchor? A. Yes, he would in a case of emergency.

"Q. But you thought you could do it better yourself? A. I thought that paying out cable in this case would not help anybody one bit. * * *

"Q. Do you think that you could have avoided the collision by beginning to slack away the chain as rapidly as you could with safety immediately when you appreciated that there was danger of collision? A. No.

"Q. Positive that it would have done no good? A. No good and, of course, you could not slack away like that, not rapidly.

"Q. How many fathoms could you slack away in a minute with safety? A. Six or seven fathoms."

Sims, of the Navesink, has testified that it would have been necessary for the Swinburne to have paid out "some 30 or 40 fathoms of chain and to have drifted back with the tide and wind in order to avoid the collision." John K. Robinson, formerly Rear-Admiral, United States Navy, called by the petitioner as an expert, testified that it would have taken three to five minutes to pay out this amount of chain, and the government's own expert testified that the Swinburne would go astern only 15 or 20 feet in the first minute. While these are merely estimates, they represent the opinions of mariners of long experience in handling large vessels. Taking these into consideration and all the conditions and circumstances, I think it very doubtful if the watch on the Swinburne could have avoided the collision in the time which was left after receiving the warnings from the Navesink or in the time in which they should

have reasonably been aware of the danger. The Navesink had made several trips, and apparently there was nothing to suggest to the watch on the Swinburne that she was likely to get out of control, nor can I say, looking back at the situation, that the watch officer on the Swinburne was lacking in judgment or prompt action in himself running to the forecastle to see what might best be done instead of immediately ordering the seaman stationed on the forecastle to pay out her anchor chain. The anchorage ground astern of the Swinburne was crowded with vessels, and it would be a serious situation for all if the Swinburne went adrift and she was carried down upon them. It was also possible that the taut anchor chain might act as a fender. It is fair to assume that he too believed that it would have been necessary to get out 30 to 40 fathoms of chain to avoid the collision and that this could not be done in time. But assuming that if he had given the order to pay out the chain as soon as the danger was imminent, the collision might have been avoided or the situation eased, he was confronted with a sudden emergency and acted reasonably and cannot fairly be accused of negligence or condemned. It is urged that the Swinburne's watch should have observed and realized the danger sooner, but her watch did discover it even before the navigating officer on the Navesink did and blew warning whistles.

Viewing the situation as it was suddenly presented to the officer of the Swinburne, as we should in passing upon his acts, to hold him liable it must not only be found that what he did was wrong, but so poorly considered and plainly wrong, that a competent navigator if placed in his situation would not have done it and could and would have acted more effectively. Such a finding is not, in my opinion, justified by the circumstances. If he did err, it was an error of judgment such as any competent navigator might have committed under like circumstances. I find the Swinburne free from fault. See The Walter A. Luckenbach, 14 F.(2d) 100 (C. C. A. 9), certiorari denied 273 U. S. 741, 47 S. Ct. 335, 71 L. Ed. 868; The Mary T. Tracy, 8 F.(2d) 591 (C. C. A. 2); Allen & Robinson v. Inter-Island Steam Nav. Co., 34 F.(2d) 83 (C. C. A. 9); The Glendola, 47 F.(2d) 206; The City of Macon (C. C. A.) 121 F. 686. The collision was caused solely by the Navesink losing her steerage way and getting out of control and being carried by the strong ebb tide and wind against the Swinburne.

As I stated at the end of the trial, the Caronia is entirely free from fault or criticism. She was proceeding on up a usual course through the Narrows bound for "Quarantine," intending, upon her arrival in the vicinity of the junction bell buoy, to alter her course to the westward, which would have carried her a considerable distance not only to the westward of the Navesink but also of the Swinburne. This is the course which she did take and which Sims of the Navesink admitted he was confident she would. The only way in which she entered into the situation at all was that the Navesink, after dredging down to the southerly Buoy A and having a full load of dredging material, intended passing out through the Narrows to sea and might meet the Caronia in the vicinity of the junction buoy. But there was no trouble to be anticipated from this, if the engines of the Navesink were sufficient to keep her under control.

A decree may be entered in accordance with the above.