## THE DALY NO. 67.

## THE WALTER TRACY.

## THE MARY T. TRACY.

### No. A-16224.

District Court, E. D. New York.
July 1, 1942.

Mahar & Mason, of New York City
(Frank C. Mason, of New York City, of
counsel), for libelant.

Macklin, Brown, Lenahan & Speer, of
New York City (Gerald J. McKernan, of
New York City, of counsel), for claimant.

BYERS, District Judge.

Recovery is sought for the coal barge
Daly No. 67 from the steamtugs Walter
Tracy and Mary T. Tracy for damages to
her middle bow bitt, one or more port side
cleats and her cabin, during the night of
December 28-29, 1940. The Daly No. 67,
loaded with 540 tons of coal, was in a tier
of 10 or 12 loaded coal boats lying on the
north side of Central Railroad of New
Jersey Pier 18, Jersey City, near the off-
shore pier end; she was the second boat
outboard from the pier, and laid bow in, be-
tween the Sharpshooter to port and the
Cape Mercy to starboard, both bow out.
Lines were rigged as hereinafter stated.

She was smaller than the other boats in
the tier, having a capacity of 600 tons, as
compared with 1,000, 1,200 and 1,400 tons
capacity of the others. She was so placed
on December 16th and remained without
damage or incident until the night in ques-
tion. Whether she was originally placed
as the number 2 boat from the pier, or at the
end of 9 or 10 boats and worked her way
in, is in dispute, though it makes little dif-
ference in the outcome, which theory be
adopted.

Soon after midnight of December 28th,
the captain of the Daly No. 67 was awak-
ened from his sleep by the sound of break-
ing lines, and promptly went out of his
cabin to the after deck, to discover that the
entire tier of boats was fanning out into
the river, and that one of his lines to Pier
18 had snapped, as had his lines to the
Sharpshooter, and that a bow line leading
from the Cape Mercy to the pier had fouled
and wrecked his cabin. He called to the
Mary T. Tracy, which he then observed ly-
ing at the end of the tier—as to this the
evidence is sharply in conflict—and that tug
and the Walter Tracy shoved the boats
back into alignment, as the result of a
half hour of effort.

Then the Daly No. 67 was towed by the
Walter Tracy to a tier of Tice boats, lying
at Pier 17.

The libel alleges as to the tortious conduct
of the tugs: "At about 11:30 p. m. the tugs
Walter Tracy and Mary T. Tracy were
manoeuvering about the pier, placing and
removing the boats, and caused the stern
line of one of the barges to the dock to part.
This placed all of the strain on the bow line
of the #67 with the result that the middle
bow bitt and the line were broken and the
cleats were started up and broken along
its sides as the boats began to fan out in
the direction of the river. * * * After
the accident one of the tugs removed the
#67 and placed it in the Tice tier where it
should have first been placed."

The specifications of the tugs' dereliction, apart from the stereotyped formula touching incompetence and lack of lookout, are: (a) Wrongful placing in the said tier instead of in the Tice tier; (b) failing to shift to the latter as requested; (c) disregard of bargee's protests (at being in the outer tier); (d) that the tugs in manoeuvering about the tier placed excessive strain on the lines and caused one of them to part; (e) overloading the lines of the inner boats; (f) failing to examine the lines of the inner boats to ascertain if they were sufficient to withstand the added weight of outer boats, and (g) failing to remove the latter to prevent breaking adrift.

As to the first three, it will be seen that in effect there is a charge of neglect of duty arising from a contractual relationship between the Tracy tugs and the No. 67, and the evidence does not sustain any such cause, nor was there an attempt to prove one.

Apparently Pier 18 is the property of the Central Railroad of New Jersey, and contains a coal dumper. Light coal boats are brought there by tugs hired by the owners or charterers of the barges, and are berthed at the south side of the pier in convenient tiers, awaiting loading. Then as to the No. 67 a Tracy tug took her around to the north side by the dumper, where she received her cargo. Whose duty it was to do that shifting did not appear; being loaded, the No. 67 was again shifted by a Tracy tug, to the tier in question, awaiting departure at the order of her charterer. Why the Walter Tracy instead of a Tice tug did that, was not shown; it was testified that the dock foreman directed that she be removed from the dumper, and that the Walter Tracy placed all loaded barges in one of three parallel tiers extending northerly from the north side of Pier 18, and endeavored to maintain these tiers of nearly uniform size. That this is the customary usage at that place, and the tiers run to a dozen or more boats, and that the pier foreman looks at the inner lines.

It seems that this falls short of spelling out a contractual duty, between the Walter Tracy and the No. 67, which would survive the act of properly placing her in an available tier. If that is true, there was no breach of duty on the part of the Walter Tracy, in failing to remove the No. 67 from the outer tier at the request of her captain, assuming that he made such a request, which he asserts and the navigator of the Walter Tracy denies. The bargee says that he realized that his craft was too small to sustain the "heft" of the 8 or 10 larger and heavier laden coal boats, and that during the interval between December 16th and the night of the 28th he made the same removal request to the pier foreman and, of more importance, to his owner on the telephone. That conduct is consistent with his recognition that the Walter Tracy owed him no duty subsequent to December 16th, and since he holds both a navigator's and an engineer's license, and has owned and operated his own tugs, his understanding of the situation is significant.

Since there was no effort to prove any breach of a contractual obligation on the part of the Walter Tracy to the Daly No. 67, so much of the specifications is deemed to have evaporated.

Perhaps it is not a cause for wonder that the libelant's cause was pleaded and exhibited in a somewhat impressionistic manner, and with a somewhat casual inattention to detail. The breaking away occurred in the dead of a winter night, and libelant's only eye-witness was the bargee of advanced years, who was abruptly awakened from his well-earned rest, and who was confronted by a situation in which his powers of observation had to yield to the preoccupations of the moment. Naturally the libelant wants some one else to pay for his repairs, but whether the claimant's tugs should bear the burden invites a careful study of the evidence.

The alleged tortious conduct of the tugs must be considered separately: As to the Mary T. Tracy, it is asserted that she was lying "next to the outside boat" of the tier when the bargee came on deck. Incidentally he was confused about the side of his boat that he was on when he made that observation. He then "hollered over and I told him the boats broke loose"; then "she shifted and then went pushing, trying to hold the boats up".

That testimony as to the Mary T. Tracy's position is not accepted because: It is opposed to the reasonable probabilities that this tug would be in the position stated at shortly after midnight, for there would be no cause for her to be there. Her log sheets show that she had in tow at near this time a light boat which she brought in to the north side of this pier, further inshore. While letting go of her, the navigator received a whistle signal from the Walter Tracy to assist in shoving the

tier, which by then had broken away as stated. He responded to that request, and circled around the tier and put a line on an outer boat, and so assisted as requested. That testimony was convincing and was corroborated by the pilot of the Walter Tracy, and is accepted. It results that there was no cause shown against the Mary T. Tracy. The criticism of her log as to the insertion of the time "1.30 2.20 AM" is doubtless well founded, but I can see nothing reprehensible about adding the time as an afterthought, when the writer perhaps realized that the entry already made was deficient in that respect.

As to the Walter Tracy, the fault attributed is the familiar one of landing a barge or two at the outer end of the tier "without seeing that the fastenings of the inside barges were proper". See The Bartle Daly, 2 Cir., 45 F.2d 605, 606, and cases cited.

There can be no doubt that just prior to or after the midnight in question the Walter Tracy landed the loaded coal barge G. B. Johnson, a Tracy boat, at the end of tier No. 1, and had earlier on December 28th also placed at least one such barge in the same tier. After placing the Johnson she took a light deck scow from the north side of the pier over to the south side, to receive a load of cinders; then her navigator went to the dock foreman for orders, and then apparently took the tug alone back to the north side of the pier; during that movement, the pilot observed the tier "hanging out on one line toward the river". Then the Walter Tracy started her efforts to shove the tier back in place and, because of delayed progress, signaled to the Mary T. Tracy (then about to leave an inshore position on the north side) to come to her assistance, as has been related.

The said landing of the G. B. Johnson was not accompanied by any inspection of the lines of any of the boats constituting that tier, which would seem to constitute fault within the rule stated in Pennsylvania R. Co. v. James McWilliams Towing Line, 2 Cir., 277 F. 798, and the cases referred to in the Bartle Daly opinion above noted —provided that such placing of the G. B. Johnson was the cause of the breaking away.

As to that, the testimony leaves the issue much involved, because the navigator of the Walter Tracy testified that, when he had completed the restoration of the tier to its normal position, and after he had taken the Daly No. 67 in tow to place her with the Tice boats at Pier 17—which carried him outside of the tier as reconstituted—he observed another loaded coal boat outside the G. B. Johnson, and he said that he did not place her there, or observe another tug so engaged. If that boat's presence could be deemed established, the Walter Tracy obviously would not be responsible for overloading the tier.

The testimony sounded convincing as it was given, particularly as the witness said that, while he was working the tier back in position, he played his search light around, which was a second time that he saw the unidentified outside boat; since the G. B. Johnson was a Tracy boat—which does not mean that she was owned by the claimant of the tug, because of different corporate constituency—it is a reasonable inference that the G. B. Johnson's bargee could have been called to testify on the question of whether there was another coal boat landed outside after the Walter Tracy had placed his boat in the tier.

The failure to do that or to account for his absence, or to otherwise trace the movements of that boat on Sunday morning, the 29th of December, 1940, suggests to this Court that the testimony is insufficient to exonerate the Walter Tracy for failure to inspect the inner lines when she placed the Johnson on the end of the tier, on the theory that overloading may have been thereby accomplished. Whether this can be supported as a reasonable inference may be open to question, but no other explanation has any support in the evidence.

In this connection, something should be said about the inner lines.

According to libelant's exhibit 4 prepared by his proctors at the request of the Court, and verified by the captain of the Daly No. 67 when testifying, the Sharpshooter, which lay next to the pier, was held by bow and stern lines from her offshore corners leading to the pier, and by spring lines from her starboard side; the Daly No. 67 (lying bow in) had her own lines running to the Sharpshooter, and a line from the port stern corner to the dock and another from a forward bitt to the dock; that was a 7-inch good line (probably in contrast to her other lines).

The Cape Mercy had lines out from her starboard side to the port side of the Daly No. 67 and also lines from her bow and stern starboard corners to the dock.

The captain of the Daly No. 67 states that the stern line last mentioned, from the Cape Mercy to the dock, parted, and she and all the boats outboard of her started to swing out toward the river, which caused the bow line leading from the Cape Mercy to the dock to damage the cabin on the Daly No. 67. Incidentally, it is difficult to see how that could occur, because the swing out toward the river would seem to preclude contact between that bow line rigged from the starboard bow corner of the Cape Mercy to the dock, and the low cabin on the Daly No. 67, but no one has made any point of that, and the cabin was indeed damaged, and so the subject does not admit of much discussion.

As to the lines leading from the Cape Mercy, the captain of the Cape Walker, next to her on the outside, testified that on the afternoon of December 28th he assisted the captain of the Cape Mercy (which was next outboard of the No. 67) to put a line out from the stern and one from the bow, to the dock, because the lines from the Cape Mercy to the No. 67 were not deemed safe, by which it is assumed that he really meant that the Cape Mercy's lines leading to the No. 67 might not be securely held on the latter because of her questionable sturdiness on deck, and because the lines from the No. 67 to the Sharpshooter appeared to be spliced and worn.

The foregoing is deemed to state what would have been discovered if a deck hand from the Walter Tracy had made an inspection of the lines which had to sustain the burden of holding the outer 6 or 7 boats to the pier.

There is no evidence as to what caused this tier of boats to break away shortly after midnight. There was an ebb tide of about two miles an hour, which would naturally take effect near the end of the pier, but no sudden gust of wind or other happening seems to have brought about the action of the boats, but in any case the line leading from the starboard stern corner of the Cape Mercy to the dock gave away, which put a heavy strain on the lines holding her to the No. 67. The lines which held the No. 67 to the Sharpshooter and her bow line to the dock also snapped, and thus the damage ensued. Incidentally the testimony makes it clear that the cleats supporting the lines leading from the No. 67 to the Sharpshooter were based upon bed pieces which were impaired by dry-rot.

The Daly No. 67 was an old boat, and her physical condition was obvious to the foreman on the dock, and to any one else who took the trouble to observe, as the tier in which she was placed was undergoing constant changes during each day, due to the placing and removal of boats.

One of the difficult features of the case has to do with the Cape Walker, which lay directly outside of the Cape Mercy.

The log of the Walter Tracy indicates that the Cape Walker, the fourth boat, was placed in that tier some time after 4:35 a. m. on December 28th, but when this was done does not appear. It is impossible to describe the placing outboard of her, of six or seven boats during the ensuing hours, or to name the tug or tugs so employed, as the evidence is silent upon that subject.

An important matter, which cannot be overlooked, is the testimony of the captain of the No. 67, that he telephoned his owner during the early days between December 16th and December 28th, protesting that his comparatively light boat was in a position of danger, since so many larger and heavier loaded boats were being landed outside of the No. 67. His testimony was not denied or questioned by Mr. James Daly, who was a witness for the libelant, and it therefore stands uncontradicted.

Reference has been made to this captain's training and experience, and it is difficult to understand why his warning was disregarded. That proof distinguishes this case from those above cited on the general subject of the duty which pertained to the Walter Tracy of inspecting the lines holding the inner boats to the dock, and demonstrates fault on the part of the owner, which is believed to render him at least equally culpable with the Walter Tracy for the damages. An owner, having actual knowledge of the hazardous position of his boat for some days, cannot shift the result of his indifference to an agency owing no contemporaneous affirmative duty to remove his boat.

The criticisms made about the sturdiness of the Daly No. 67 in respect of her cleats and bow bitts are believed to be justified, but that does not exonerate the Walter Tracy for having added the G. B. Johnson at the end of the tier, without ascertaining whether the No. 67 and her lines would constitute an element of weakness in the tier as then constituted.

Such a duty should have been performed, if not by the pier foreman, then by the Walter Tracy.

The findings are as follows:

1. The Daly No. 67, 103 feet long, 23.6 feet in beam, and with a capacity of 600 tons, was loaded with 540 tons of coal on December 16, 1940, at Pier 18 of the Central Railroad of New Jersey, and she was then the property of Bartle J. Daly, Jr., the libelant.

2. The Daly No. 67 was placed by the tug Walter Tracy in tier No. 1 on the north side of the said pier, at a distance of about 10 feet from the end thereof, on the day in question.

The Walter Tracy was the property of the Tracy Towing Line, Inc., the claimant.

3. The said pier was about 1725 feet long.

4. On the afternoon and evening of December 28, 1940, and during the night, there were about eight boats in tier No. 1 outside of the Daly No. 67, all of which were loaded with coal and carried from 1,000 to 1,400 tons, and all were larger than the Daly No. 67.

5. The Daly No. 67 had lines out to the boat next inshore from her, and a bow and a stern line to the dock.

6. Around or shortly after midnight, the tug Walter Tracy placed the loaded barge G. B. Johnson at the outboard end of the said tier, without causing any examination to be made concerning the fastenings of the inside barges.

7. Early in the morning of December 29th, the tier fanned out into the North River, causing damage, as a result of which the No. 67 went partly adrift and her lines leading to the inside barge were broken and cleats on the port side of the No. 67 were pulled out and bent over and her middle bow bitt was damaged; also a line leading from the boat directly outside of her damaged her cabin.

8. The position of the Daly No. 67, as a second boat in a long tier of loaded coal boats which were larger and heavier and of greater capacity than she was, was one of peril from the time when she was placed in such tier, and this fact was duly communicated by her bargee to her owner, and no action was taken by the latter to cause her to be removed from the said tier.

9. The tug Mary T. Tracy neither by act nor omission contributed to the breaking away of the said tier or to the said damage caused upon the Daly No. 67.

Conclusions.

I. The Walter Tracy was at fault for landing loaded coal boats at the end of the said tier without causing the fastenings of the inside barges to be inspected to ascertain if they were adequate to sustain the weight of the said tier.

II. Bartle J. Daly, Jr., the owner of the Daly No. 67, was at fault for having permitted the Daly No. 67 to remain in that tier, with knowledge that her captain considered the position to be one of peril.

III. The Walter Tracy should be held for half damages sustained by the Daly No. 67, to her cabin and her cleats on the port side, and her middle bow bitt, to be ascertained by a commissioner appointed in the usual course.

Settle decree.